GAINES v. GRAND TRUNK RAILWAY CO. OF CANADA.

1. RAILROADS—MASTER AND SERVANT—EMPLOYERS' LIABILITY ACT —NEGLIGENCE OF FELLOW SERVANT—CONTRIBUTORY NEGLIGENCE. Plaintiff left his work of repairing a car to assist two fellow laborers in fixing a "gun barrel drawbar," part of a Westinghouse friction gear. On striking the coupling or drawbar with a hammer, a spring was released which flew and struck plaintiff, injuring him severely. He did not know of the presence of springs in the drawbar and was not familiar with the construction of the coupling, but placed himself in front of the gun barrel and struck it. *Held*, that the Federal employers' liability act was

controlling and that there was no liability if plaintiff assumed the risk of his injury, a defense open to defendant, as it was at common law, and that he must prove actionable negligence on the part of his employer. 35 U. S. Stat. 65, U. S. Comp. Stat. 1913, §§ 8657-8665.

2. SAME—NEGLIGENCE—DEFECTS.

It was the intention of Congress to base the action upon negligence only and exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence.

3. SAME—INSTRUCTING SERVANT—DUTY.

A master is not called upon to anticipate every possible accident, and may leave an employee to learn the hazards of the business as he learns the business itself, from his associates and experience, where the hazards are not extraordinary.

4. SAME—RISK ASSUMED—NEGLIGENCE.

Where the relationship of master and servant existed, and, though not directly ordered to do what he did, where he was acting in the line of his employment, which was the repair of cars, including drawbars, plaintiff could not be said to have acted as a mere volunteer, but, under the recognized rule that workmen engaged in repair work of defective or dangerous appliances, etc., assume the added risk incident to the existing condition of the instrumentality or place of work, he could not recover.

5. SAME—GENERAL RULE.

One engaged in the repairing of defects assumes the risk of injury incident to their damaged condition, the risk being an ordinary one.

Error to Shiawassee; Gilday, J., presiding. Submitted June 13, 1916. (Docket No. 67.) Decided September 27, 1916.

Case by Clarence D. Gaines against the Grand Trunk Railway Company of Canada and others for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Terry & Parsons*, for appellant.

*Harrison Geer (W. K. Williams,* of counsel), for appellee.

STEERE, J.   While employed as a car repairer in defendant's repair yards at Durand, Mich., plaintiff was injured as the result of striking the plunger of a defective drawbar with his hammer and thus releasing the compressed spring at its base, which threw the plunger, or other interior parts upon which the spring acted, violently out of the end of the drawbar in front of which he stood, and against him.   On a former trial it was shown that the drawbar was part of a foreign car which came under defendant's control while engaged in interstate commerce, and was then being repaired in compliance with requirements of a Federal act, for which reason it was held by this court that, if any action would lie, recovery would be possible only upon a declaration framed under an appropriate Federal law.   181 Mich. 376 (148 N. W. 397).   Plaintiff's declaration was amended to comply with this suggestion prior to the trial now here for review, at which the court under a directed verdict rendered judgment of no cause of action on the ground that no negligence on defendant's part was shown; and "there was no emergency calling for assistance from plaintiff relative to that car.   That the services he was attempting to render were merely voluntary and he, being a volunteer, assumed the risk of all dangers incident to the work at hand; and that he did, as a matter of law, assume the danger of the spring in the friction draft gear, when released, flying out and injuring him."

The substance of defendant's charged negligence, as more elaborately detailed in plaintiff's declaration, was failure to properly inspect the crippled car and more definitely determine the nature of its defects, failure to warn plaintiff of the dangers attending an attempt

to take apart a drawbar of the kind and in the condition of the one by which he was injured, and failure to instruct him as to the proper and safe way of doing so.

The accident occurred December 7, 1911. Plaintiff had then been steadily in defendant's employ as a car repairer at Durand since July 27, 1911. About 30 men were employed in the repair yards under a foreman named Decker. Under him was an assistant foreman, or head car repairer, named Seeburger, directly in charge of the work, whose duties were to direct the men and see that the repairs were properly made. The repairers generally worked upon the various cars which had been placed in the yard on one of the special tracks for repairs in couples, to most effectually carry on the work and readily assist each other as the nature of the repairs to be made at times required.

Plaintiff testified that when first employed he had no previous experience in that capacity and was directed to go to work the next morning with a car repairer named Bullock, as his helper, which he did, continuing to work under and most of the time with him until injured. Bullock testified that when plaintiff came to work with him he had himself been working there "possibly three months." Each from the beginning received equal pay; all repair men in the yard doing that kind of work being paid the same wages. Their work as general car repairers varied according to what was required, consisting of changing wheels, putting in or on column bolts, brake beams, handholds, brake shoes, levers, repairing defective drawbars, etc., and in general making any and all required repairs below the body on cars sent to the repair yards, or "rip tracks," for that purpose and marked with a "bad order" card, except needed repairs on air brakes and any required carpenter work.

Plaintiff's intelligent description of the nature and

193 Mich.—26.

method of doing this work, and of the various parts and appliances of the different cars sent in for repairs, about three to one being foreign cars as he recollected it, was strongly confirmatory of Bullock's statement that in almost daily making or assisting in making the various kinds of repairs required plaintiff's experience had been such that he would understand any defective condition in a car as well as Bullock. Plaintiff called Bullock his foreman. Bullock called plaintiff his partner, and in explanation testified that he "wasn't foreman, but we worked together. He came to me and asked me how you would do things, and I would tell him best I knew how; * * * and a little later they put a fellow in there with us named George Everson"; that Seeburger directed them as to the work they should do, but they did what they saw was to be done and there was no difference as to which one should do certain parts, each assisting the other when called to come and help, and he thought "it would be with my partner to come and help me without my asking him"; that there were from 50 to 100 cars on the rip tracks for repairs most of the time, more of them foreign cars than those of defendant, requiring repairs before they could go further. It may fairly be inferred from their testimony that while the two workmen were of the same rank and pay, when working together as they usually did, plaintiff looked to and followed the directions of Bullock, who was the older employee, whenever any question arose as to what he should do next or how any special thing should be done.

On the day of the accident Bullock had left plaintiff at work alone repairing a wooden gondola D. & M. car, "putting in draft timbers, bolts, brake shoes, etc.," as plaintiff describes his work, and Bullock was working with Everson on a B. & O. car near by, the coupling of which was out of repair owing to some defect in

its drawbar or draft gear. The cars of that line were equipped with a drawbar, known as the Westinghouse friction gear, commonly called in railroad parlance a "gun-barrel drawbar." It was shown that all drawbars work upon the same principle and contain springs to relieve the shock of cars coming together, but they vary in appearance and detail of construction, some being incased entirely in iron and some in wood and iron, other types being more common than the "gun barrel" which had, however, been in service on some eastern roads for 12 or 14 years, being used by the Pennsylvania, Chesapeake & Ohio, and Baltimore & Ohio systems. This drawbar had a cylindrical metal outer shell said to be about 8 inches in diameter and 20 inches or more in length. Two springs, one within the other, were placed at the rear or bottom of the barrel with a plunger having an enlarged base against them and two other springs ahead or above the plunger at the forward or open end of the draft gear fastened to the coupler or drawhead, the entire drawbar weighing 200 pounds or more. Bullock and Everson removed this drawbar from the car they were repairing and laid it beside the track. They had discovered that the upper or front springs were broken and the plunger compressed too far into the cylinder. The springs at the base of the plunger were not visible, but they knew that they were either compressed or broken, and that it was necessary to remove the plunger to ascertain which. Failing to easily release the plunger, Bullock called over to another car repairer named Edison to come and look at it, saying, as he testified, that he thought "there is another spring down in there; you have got to take off this cap and see whether it is broken." The consensus of opinion apparently was that the spring was broken and Edison hit the plunger several times in an unsuccessful attempt to get it out. Bullock then placed two wooden blocks on

the ground with a space between them, ending up the drawbar so the plunger would be between them and attempted to loosen it by jarring the drawbar up and down on the blocks.

Plaintiff had just then finished making repairs to the car upon which he had been working alone all the morning, and went over where they were working for the purpose, as he states, to "receive orders" from Bullock, "to find out what to do," and noticed that they were trying to release the plunger in the gun-barrel drawbar which he saw lying on the ground, of which he says he "had never seen a device of this kind before," that "it was a very peculiar affair," but "what it was I didn't know." Having observed their unsuccessful efforts, he set the drawbar on end with the plunger pointing up towards him and striking it with his hammer released the spring, with disastrous results to himself. Of the event he testifies:

"Then I set the gun barrel up in the same position it was when Mr. Edison was hitting it with a two-pound machine hammer, struck it with a common, ordinary blow and before I came to myself, I was hit, cut, and knocked down and jarred internally. * * * I never examined it at all, just looked at it and hit it with the hammer as it appeared to me the trouble indicated was that the plunger was stuck to one side and all that was necessary was to straighten it up and put on new springs and put it back in its proper position."

Also that he did not know there were springs at the base or that there was any danger in doing as he did.

Bullock's undisputed description of plaintiff's intervention and the accident is as follows:

"When Edison and I were there at work I saw Gaines come up and Gaines suggested to me to let him try it. He said, 'Let me try it; I can get it.' Without any instructions from Edison or me he took

the hammer and struck it on the side. He had to bend over it in order to hit it and when he struck it it let loose, and which is the way the accident occurred."

Seeburger, the repair foreman, testified that his general duties were to see that the repairs on the rip tracks in the yard were properly made, and to direct and instruct the men with reference to the work, and that many Baltimore & Ohio cars are repaired there each year; that he was there on the day of the accident, although he could not say whether he saw the gun-barrel drawbar in question, but when any such condition arises with any of the workmen in making repairs they could and should refer the matter to him first before attempting to make the repair "if they didn't understand how to handle it."

This action being brought under the so-called Federal employers' liability act of 1908 and amendments thereto (35 U. S. Stat. 65, U. S. Comp. Stat. 1913, §§ 8657-8665), that statute and decisions of the Federal courts upon it are controlling. By it the defense of fellow-servant's negligence is taken away and contributory negligence does not bar recovery, being available only in reduction of damages proportionate to the amount of negligence attributable to the employee.

The rule as to the assumption of risk remains, except in those cases where the defendant has been guilty of violating some statute enacted for the safety of employees, and by such violation contributed to the injury complained of. In *Seaboard Air Line Ry.* v. *Horton*, 233 U. S. 492 (34 Sup. Ct. 635, L. R. A. 1915C, 1, Am. & Eng. Ann. Cas. 1915B, 475), the court said upon that subject:

"It seems to us that section 4, in eliminating the defense of assumption of risk in the cases indicated, quite plainly evidences the legislative intent that in all other cases such assumption shall have its former

effect as a complete bar to the action.   *   *   *   The risks may be present, notwithstanding   *   *   *   all reasonable care on his (plaintiff's) part.   Some employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of his duty.   Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages.   And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not."

No violation of any safety appliance act or other statute, nor negligence of fellow servants, are involved here; but the defense of assumption of risk is open as at common law, and it is to be borne in mind that, however the accident happened or whatever the result, there is no liability under the statute unless plaintiff shows that he was injured through the actionable negligence of his employer, and not otherwise.   This thought is thus emphasized in the *Horton Case:*

"It was the intention of Congress to base the action upon negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence."

The fact of an accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence.   *Texas, etc., R. Co.* v. *Barrett,* 166 U. S. 617 (17 Sup. Ct. 707).

It may well be questioned whether the employer is required to anticipate the possibility of an accident of this nature resulting from the peculiar combination of events disclosed here.   As is often the case, the cause of this accident is easiest understood, and the danger to which plaintiff was exposed is best appreciated and apprehended after the fact, for the accident itself not only reveals the cause, but after its occurrence forcibly suggests what might have been done to avoid it.

"The master has a right to expect him (plaintiff) to be alert to inform himself of existing conditions, and he cannot attack the master from the shelter of unjustifiable ignorance. * * * Actual ignorance will not alone suffice to charge a master." *Ragon* v. *Railway Co.*, 97 Mich. 265 (56 N. W. 612, 37 Am. St. Rep. 336).

"A master is not called upon to anticipate every possible accident, and may leave an employee to learn the hazards of a business, as he learned the business itself, from his associates and experience, where the hazards are not extraordinary." *Nowakowski* v. *Stove Works*, 130 Mich. 308 (89 N. W. 956).

All drawbars contain springs working upon the same principle, and plaintiff was not unfamiliar with drawbars. He was not immature nor inexperienced; the evidence shows that he was an experienced man of mature years and fair intelligence, with ability to understandingly describe and discuss the nature of the work done at the repair yards where he was employed and the method of carrying it on. He explained the parts and purposes of drawbars upon which he had worked, described the coiled springs used in them, and stated that if there weren't springs in there when the cars came together "they would all smash to pieces." When the accident occurred he had been in this service a longer period of time than Bullock had been when plaintiff states that he was put at work under Bullock, who acted as his instructor and foreman.

The bare contention that plaintiff was a "volunteer" and thereby absolutely precluded from recovery is manifestly not tenable. Technically he was not a volunteer, for it is shown that the relation of master and servant existed between him and defendant, and that, while not directly ordered to do what he did, he was acting in the line of his employment, which was the repair of cars, including drawbars. He was, however,

a volunteer in the particulars that he was not put at work upon this car by any one, nor called upon to assist those who were, that there was no emergency demanding his intervention and he was neither ordered, directed, or requested to do this work. He assumed, uninvited and without any instructions, to do work upon an article which he claimed he had never seen before, had no knowledge of, did not examine, and in relation to which he made no inquiry. He testified:

"I knew it was a piece of iron. What it was I didn't know."

Its appearance seems to have suggested the popular name of a gun barrel, but without examining it or asking any questions of those working upon it he placed himself over the muzzle of this "gun barrel," with a plunger projecting from it and successfully proceeded to try if he could "get it." While not precluding recovery, these facts have a significant bearing upon defendant's duty to him in connection with this accident and his assumption of risk.

In connection with the foregoing it is to be borne in mind that defendant's liability was qualified by the nature of plaintiff's employment, which was for the express purpose of assisting in repairing unsafe and defective instrumentalities and restoring them to a normal condition of efficiency and safety. The recognized general rule as to that class of employment is that workmen engaged to diagnose, repair, and make safe a tool, piece of machinery, appliance, or place to work, which is defective, out of repair, or dangerous, assume the added risk incident to the existing condition of the work or place.

"A person employed to repair defects in appliances assumes the risk of injury incident to their damaged condition. It is the work which his duties require him

to perform, and hence is an ordinary risk." 2 Bailey on Personal Injuries (2d Ed.), p. 985.

This rule is more fully stated with citation of numerous authorities in 3 La Batt on Master and Servant (2d Ed.), § 1176, and quoted with approval in *Baxter* v. *City of Lansing,* 190 Mich. 542 (157 N. W. 70).

In the light of the foregoing authorities and others to which they refer, we are impelled to conclude that under the undisputed and controlling facts in this case plaintiff is precluded from recovery by having assumed the risks incident to the employment in which he was engaged when the accident complained of occurred.

The judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.