## P. F. COLLIER & SON CO. v. HARTFEIL.
### No. 9950.

Circuit Court of Appeals, Eighth Circuit.
Aug. 13, 1934.

Roy J. Mordaunt, of St. Paul, Minn. (John J. Sexton, of St. Paul, Minn., on the brief), for appellant.

Charles E. Carlson, of Minneapolis, Minn. (Fred A. Ossanna and Cyrus V. Hoaglund, both of Minneapolis, Minn., on the brief), for appellee.

Before SANBORN and WOODROUGH, Circuit Judges, and DEWEY, District Judge.

SANBORN, Circuit Judge.

On August 29, 1932, at about 10 o'clock a. m., a Dodge sedan belonging to and driven by H. Elsa Hartfeil collided with a Chevrolet coupé owned and driven by Arthur F. Mehrstedt. Miss Hartfeil was seriously injured, and she brought this action against Mehrstedt, Standard Historical Society, Inc., and P. F. Collier & Son Company, alleging that the accident and her injuries were due to the negligence of Mehrstedt and that at the time the accident occurred he was in the employ of the other defendants and operating his car in the furtherance of their business. (P. F. Collier & Son Company will be referred to as "Collier," and the other parties as in the court below.) The defendant Mehrstedt an-

swered, denying that he was negligent, but admitting the allegations of the complaint as to his employment by the other defendants. The plaintiff dismissed as to the Standard Historical Society, Inc. Collier answered denying that Mehrstedt was its employee. The plaintiff had a verdict against Mehrstedt and Collier. From the judgment entered thereon Collier appeals. ·

■ The main assignment of error is the refusal of the court to direct a verdict for Collier on the ground that there was no substantial evidence that Mehrstedt was its employee.

In considering this assignment, we are, of course, obliged to take that view of the evidence most favorable to the plaintiff, remembering, however, that the burden was upon her to prove that Mehrstedt was an employee of Collier, and not upon Collier to prove that he was not.

To establish that Mehrstedt was an employee of Collier, the plaintiff relied mainly upon the testimony of Mehrstedt.

In substance, his testimony was as follows: He was a book agent. In the summer of 1932 he lived at Buffalo, Minn., where his mother ran a summer resort. His residence was at Janesville, Wis. During the month of August, 1932, and for some time prior thereto he was selling books for the Standard Historical Society. Previous to that time he had sold books for Collier for approximately four years. He had never had a written agreement with Collier. He was paid by commissions. His territory was not limited. In the early part of 1932 he worked out of the Milwaukee office of Collier. He came to Minnesota about the first week of June, 1932, and advised the Minneapolis office of Collier that he was there to get some business, and gave his name and where he last worked. During the time he worked for Collier his car was insured. Collier insisted on knowing when the car had been insured "by the company." Two years prior to the accident he had paid the premium; later Collier paid it. A requirement was that he was not permitted to use a car unless it was insured by Collier. The car belonged to him, and Collier knew that he had it. He was furnished with samples, contract blanks, and other literature, but received no instructions except that "the business had to be clean business and there were to be no misrepresentations in any way." He sold books on terms fixed by Collier's New York office. The contracts for books were to be approved by the local office and to be finally passed upon by the New York office. Whenever he changed from one district to

another he had to report to the district office. During August, 1932, he had not been selling for Collier because it had an old encyclopedia that was to be supplanted by a new one. It had other works to sell, but he was specializing on encyclopedias. During the summer of 1932 he received three letters from Collier instructing him to come to Minneapolis. These letters were destroyed. On August 29, 1932, he left Buffalo for Minneapolis. One of the purposes of the trip was to go to the Collier office pursuant to instructions and because the new encyclopedia had been completed. He still had old samples belonging to Collier which it was his duty to return, and he had these samples with him and intended to return them, and it was his intention to obtain samples of the new work. He was obliged to familiarize himself with the work and intended to do so on this trip. It was while he was on his way to Minneapolis for the purpose of returning the old samples, getting new samples, and familiarizing himself with the new work, that the accident happened. During the month of August, 1932, he sold nothing for Collier. The last sale made for that company was in June, 1932. He reported the accident to Collier on or about September 2, 1932. He was discharged by Collier during the summer of 1933 and received notice of it. He had never received a notice of discharge before. There had been periods before when he had made no sales, but he continued in Collier's employ until new works were put on the market. There were many times that he did not take any business for weeks and in some instances for months, and then he would turn in business, and was not required to fill out an application blank. He had sold books for more than one concern at a time. In August, 1932, he was selling for the Standard Historical Society under an agreement covered by correspondence. He came to Minneapolis early in June, 1932, and from that time to the date of the accident sold many orders for the Standard Historical Society. During several summers prior to 1932 he had lived at Buffalo, Minn., with his mother, and each summer he made an arrangement with the Minneapolis office of Collier for the solicitation and sale of its products. On the day of the accident, products and samples of the Standard Historical Society were in his car, as well as the old samples belonging to Collier. He never returned the Collier samples. Following the accident, he took no orders for Collier until the summer of 1933, and solicited none until that time. In the summer of 1933 he applied in the Minneapolis office for the

right to represent Collier, and was required to sign an employment notice which was submitted to New York, and which resulted in his discharge. When he came to Minneapolis in the summer of 1932 Collier wanted him to sell an obsolete encyclopedia, and he sold it as long as there were any to be had. He advised Collier that he might be interested in selling the new encyclopedia, but that was not out, so in the meantime he sold the works of the Standard Historical Society and kept in touch with Collier, inquiring as to when the new work would be out, so he could see it. In the meantime he was doing whatever he wanted to do, and Collier never told him what to do, where to go or when to go, except that he was requested to come in several times. He was paid nothing by Collier from June to August, 1932, nor was Collier contributing anything to the upkeep of his car, nor did it ever pay him anything for its upkeep. He owned the car and Collier had no control over it. He had been hired first in 1928. There was nothing to sell for Collier after the latter part of June, 1932, and he was waiting for the new work. In the summer of 1932 he was helping his mother with her resort, and came to Minneapolis for provisions. He asked the Minneapolis office of Collier to let him know when the new encyclopedia arrived, and he dropped into the office several times when he came to Minneapolis in connection with the work for his mother, but mostly in connection with his work for the Standard Historical Society. During all this time he was actually engaged in soliciting business for the Standard Historical Society. When bringing his old Collier samples to Minneapolis on August 29, 1932, it was not done upon any request of Collier. If he had actually wanted to return these samples he could have shipped them or sent them any way he wanted to. During all the time he was engaged in soliciting orders for Collier he used his own means and methods of doing that soliciting. He determined where he wanted to sell and what product of Collier he would sell, the only restriction being that he sell upon terms fixed by Collier. Other than that, Collier had no control over him. The letter he received from Collier to come to Minneapolis told him that the new encyclopedia was there. The letter was received prior to August 29, 1932 —possibly as much as ten days. He had received a similar letter before and on arrival at Minneapolis he had found that the samples were not there. He did not intend to do anything with reference to this encyclopedia until he had seen it, and up to August 29,

1932, he had said nothing to the Standard Historical Society about discontinuing selling its products and taking up the sale of the Collier products. Collier at that time had no control over his movements. He paid no money in 1932 to Collier for liability insurance, but it wanted to know if he used an automobile in soliciting business. At the time he was driving to Minneapolis from Buffalo on August 29, 1932, "he was making sales for the Standard Historical Society, and that was one of his purposes for going to Minneapolis." At one time while working for Collier he had employed another man who reported his own sales and received his own commissions. Collier had nothing to do with this employee. He thought he told the Minneapolis office of Collier when he reported in June, 1932, that his car was insured, and, if he remembered correctly, the office wrote to New York to find out about it. He was told it was a new policy of the company to pay the premiums and not to require the salesmen to pay them. There was a restriction imposed by Collier that he had no right to drive an automobile while selling Collier's products unless he was insured. In 1933, after signing an employment application, he was advised that the information contained therein was incorrect, and he then received a formal notice of discharge and a demand that he return the samples then in his possession. This was the only notice of discharge he ever received from Collier. He was discharged because of the accident. He received a letter from Collier, dated September 16, 1932, reading as follows:

"Minneapolis, Minn., Sept. 16, 1932.
"Mr. A. F. Mehrstedt,
"Buffalo, Minnesota.
"Dear Mr. Mehrstedt:
"This will acknowledge your favor to our Home Office of September 12th reference your automobile accident.
"For your information be advised that the employment notice was taken out in this office on August 9th, and the accident occurred on August 29th. In other words, the accident occurred 20 days after you were no longer connected with this Branch, and consequently the matter has no bearing as far as the House of Collier's is concerned.
"Yours truly,
"P. F. Collier & Son Distr. Corp.,
"By T. C. Netzer, Mgr. Mpls. Branch."

He did not know what the language, "your employment notice was taken out on August 9th," used in Collier's letter of September 6,

1932, to him, meant, but supposed it meant that he was out of Collier's employment. He had received no notice that he was no longer employed. He had, after August 9, 1932, received a letter from the Company instructing him to come to Minneapolis to get new samples. When he was finally discharged in 1933, he was required to turn in his blank contracts. He had never been requested to do that before. On June 9, 1932, he had written to the Standard Historical Society relative to selling their products. It is only necessary to quote a portion of this letter:

"The class of business I have been taking for Collier's was for the greater part younger professional men. * * *

"In my telegram I requested your keeping this [application] confidential. I have applied for a managerial job with the above company and believe my chances of obtaining same are fairly good, and should your deal not come up to expectations it would no doubt impair my chances. However, if the earnings on your deal are as large as I visualize, the manager's job can go hang. * * *

"I am anxious to get to work immediately and if you are interested, and have not already done so, I would appreciate your sending samples, etc., at once care of this hotel."

With respect to this letter, he (Mehrstedt) stated that the statements in the letter were not necessarily true, but that he made them. On August 30, 1932, the day after his accident, he wrote the Standard Historical Society telling of the accident and sending in an order for its products, as follows:

"Buffalo, Minn., Aug. 30, 1932.
"Standard Historical Society,
"Atlas National Bank Bldg.,
"Cincinnati, O.
"Dear Mr. McGee,

"I regret to say that as I was coming home from Minneapolis, after taking the enclosed order, I was involved in a head-on collision with another car. Although my car was almost completely demolished, I suffered no serious injuries, but had to have some stitches taken in my face, and my hands and arms are so bruised that it was impossible for me until now to send in this order.

"It will be perhaps another ten days before I will be presentable enough to do any selling. I expect to be able to make arrangements that will enable me to get another car, also. In the meantime, I need all the cash I can get hold of, so if under the circumstances you can see your way clear to pay me on this order, even though there is on O. D. against my account, it would help me considerably. I am sure that as soon as the schools are open I can produce a real volume of business again, whether I have a car or not.

"In case you pay me on this order, please send the check air mail, to this address.

"Yours very truly,
"[Signed] A. F. Mehrstedt."

Mr. Netzer, district manager for Collier in Minneapolis, when examined by the plaintiff as an adverse witness, testified substantially as follows: Mehrstedt was not employed under a written contract; agents are not so employed, but he knew that Mehrstedt had been employed by the Company. When agents are employed inquiry is made as to whether they travel by train, bus, or automobile. He knew that Mehrstedt was using his own car. When agents who drive cars are employed by Collier they make out a form giving make of car, motor number and license number, and the form is sent to New York with a check for $4.10. The agent is not compelled to give this information, and the $4.10 that is sent to the home office is not charged to the agent, but to the branch. Collier carries no liability insurance on automobiles, but has what is known as "contingent liability." When an agent transfers from one district to another, he has to report to the branch office to which he transfers, and at that time inquiry is made as to whether or not his car is insured. That is one of the written rules of the Company. If the agent is not insured it is necessary to send $4.10 and a form known as Form "A." This form was not obtained from Mehrstedt when he came to Minneapolis. The agent is authorized to go out and sell to anybody, and Collier usually accepts an order upon presentation. Sometimes the purchaser is looked up. Agents are not limited as to territory and it is not necessary for an agent to report to the district manager when he goes from one district to another, but orders must come to the branch that controls the particular territory. The district manager may discharge an agent for misbehavior "or something like that." When discharged he is not given written notification. If out of the city he is written to, but if in the city he is verbally requested to resign. Agents' samples belong to Collier, but when an agent is discharged he does not necessarily have to return the samples, since they are usually of little value. In case of a new work, samples are put out and agents customarily, but not necessarily, familiarize themselves with the new work. It is not necessary to inspect the work, for all information is contained in the sample. The district

manager may call in agents to see the new samples. Mehrstedt, when he came to Minnesota, was subject to "these various things" concerning which the witness testified.

There was little in the defense testimony that aided the plaintiff's case. It tended to show that Mehrstedt did no work and took no orders for Collier during July or August, 1932, and none thereafter until the summer of 1933, when he applied for re-employment; that while he worked for Collier he was paid by commissions and was not told where to work or what time to work or what means of transportation he should use, and received no allowance for transportation; that he paid his own expenses; that it is a rule that if a salesman does not report to the office within a week or ten days after employment is taken out, he is considered no longer employed, and that no notice is given to him; that for the reason that nothing had been heard from Mehrstedt, his employment notice was taken out; that the witness, the branch manager at Minneapolis, saw Mehrstedt in July or August, 1932, and Mehrstedt told him he came in for provisions and dropped into the office to see if the samples were there; that Collier severs its relations with an agent if he does not get an order after six to ten days; that when the employment notice is taken out, it means that the man is discharged; the man has automatically discharged himself by failing to bring in business; that at the time his employment notice is taken out, he is not required to turn in his samples or blank contracts; that orders are not accepted from him unless he makes out an application for employment, but, upon the making of such an application the order would be accepted; that Mehrstedt was not working for Collier in the summer of 1932 and was not employed by it, but the assistant sales manager for Collier wrote Mehrstedt, from the Minneapolis office, several letters inviting him to call at the office; that at no time during the summer of 1932 did Collier order Mehrstedt to do anything; that Collier does not procure liability insurance for its solicitors.

The law applicable to this situation is well settled.

"A master is liable to third persons injured by negligent acts done by his servant in the course of his employment, although the master did not authorize or know of the servant's act or neglect, or even if he disapproved or forbade it. Philadelphia & Reading Railroad v. Derby, 14 How. 468, 486 [14 L. Ed. 502]. And the relation of master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or, in other words, 'not only what shall be done, but how it shall be done.' New Orleans M. & C. Railroad Co. v. Hanning, 15 Wall. 649, 656 [21 L. Ed. 220]." Singer Manufacturing Co. v. Rahn, 132 U. S. 518, 522, 523, 10 S. Ct. 175, 176, 33 L. Ed. 440.

"The test of one's liability for the act or omission of his alleged servant is his right and power to direct and control his imputed agent in the performance of the causal act or omission at the very instant of the act or neglect. There can be no recovery of a person for the act or omission of his alleged servant under the maxim, 'respondeat superior,' in the absence of the right and power in the former to command or direct the latter in the performance of the act or omission charged, because in such a case there is no superior to respond." Standard Oil Co. v. Parkinson (C. C. A. 8) 152 F. 681, 682.

"If the servant is engaged in work outside of the line of service for which he was employed, as, for instance, doing his own work, or doing the work of some person other than the master, the master is not liable for his negligence. The reason that the master, in any case, is held liable for the negligent acts of his servants is not because the servant, in his negligent conduct, represents the master, but upon the distinct ground that he is conducting the master's affairs, and the master is bound to see that his affairs are so conducted that others are not injured." Philadelphia & R. Coal & Iron Co. v. Barrie (C. C. A. 8) 179 F. 50, 52, 53.

In Howard W. Luff Co. v. Capece (C. C. A. 6) 61 F.(2d) 635, 636, the court said: "* * * one whom the employer does not control, and has no right to control, as to the method or means by which he produces the results contracted for, is an independent contractor. Gall v. Detroit Journal Company, 191 Mich. 405, 158 N. W. 36, 19 A. L. R. 1164. The latter case is the subject of a copious note in 19 A. L. R. 1164, wherein numerous state decisions are collected. Cf. 29 A. L. R. 470."

See, also, Yelloway, Inc., v. Hawkins (C. C. A. 8) 38 F.(2d) 731, 735, 736; Standard Oil Co. v. Anderson, 212 U. S. 215, 221, 29 S. Ct. 252, 53 L. Ed. 480.

Assuming in this case that the jury might have found from the evidence that whatever relationship had existed between Collier and Mehrstedt had not been severed at the time of the accident, whose work was Mehrstedt

doing at that time and who directed and controlled him in the conduct of that work?

There is in this case no proof of any agreement that Mehrstedt would devote all or any portion of his time to selling for Collier (as there was in the case of Singer Manufacturing Co. v. Rahn, supra, 132 U. S. 518, 10 S. Ct. 175, 33 L. Ed. 440); no proof that Collier had reserved any right to control or direct his selling activities, aside from the right of approving or disapproving of whatever orders he might send in for books. According to the testimony of Mehrstedt himself, he was free to sell wherever, whenever and whatever he chose. His car was his own, his time was his own, and his movements were subject to his own direction and control. The fact that he was coming to Minneapolis and while there intended to return some old samples and to inspect a new work of Collier, pursuant to instructions from Collier, is not inconsistent with the hypothesis that Collier was not his employer or that it had reserved no right to direct and control his movements. The best proof that it had reserved no right of direction or control over him during the summer of 1932 is the fact that he did absolutely nothing during July or August, 1932, to advance its interests in any way, and, on the contrary, devoted his time and efforts to selling books for another corporation. If the evidence proves anything, it proves that at the time of the accident Mehrstedt was a sort of itinerant, intermittent book agent doing what he pleased, for whom he pleased, and traveling when and where he pleased, and under the control of no one so far as operations of his automobile were concerned. The plaintiff lays stress on the fact that Collier knew that Mehrstedt had a car and had at some time had some sort of liability insurance on it. Just what this insurance was is not clear. It apparently did not cover the liability of the salesman to third persons. What bearing it has on the contract of employment or on Collier's right of direction or control of Mehrstedt in his work, is obscure. For all that we know, it may have been insurance to protect Collier against such suits as this. To our minds, the evidence in this case is more consistent with a hypothesis that Mehrstedt, at the time of the accident, was not employed by Collier, was not engaged in the furtherance of its business, and was in no sense under its direction and control, than with any other hypothesis, and therefore it totally fails to sustain the verdict against the defendant Collier.

In Virginia & S. W. R. Co. v. Hawk (C. C. A. 6) 160 F. 348, 352, the court said:

"But a case should never be left to a jury simply on a question of probabilities with a direction to find in accordance with the greater probability. Probabilities may help out items of evidence from which an inference can be drawn, but cannot take their place. To allow a jury to dispose of a case simply upon a weighing of probabilities is to turn them loose into the field of conjecture, and to have the rights of the parties determined by guess."

Where evidence is equally consistent with two hypotheses, it tends to prove neither. Patton v. Texas & Pacific Railway Co., 179 U. S. 658, 663, 664, 21 S. Ct. 275, 45 L. Ed. 361; Chicago, M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 478, 46 S. Ct. 564, 70 L. Ed. 1041; New York Central R. Co. v. Ambrose, 280 U. S. 486, 489, 490, 50 S. Ct. 198, 74 L. Ed. 562; Gunning v. Cooley, 281 U. S. 90, 94, 95, 50 S. Ct. 231, 74 L. Ed. 720; Ewing v. Goode (C. C.) 78 F. 442, 444; Stevens v. White City, 285 U. S. 195, 203, 204, 52 S. Ct. 347, 76 L. Ed. 699; Eggen v. United States (C. C. A. 8) 58 F.(2d) 616, 620; Claywell v. Inter-Southern Life Ins. Co. (C. C. A. 8) 70 F.(2d) 569, 571.

We appreciate that the plaintiff sustained severe injuries in this accident, for which she should be compensated. Evidently Mehrstedt is a person of no financial responsibility. Sympathy for the plaintiff, alone, however, will not justify the placing of Mehrstedt's burden upon Collier's back.

Our conclusion is that the court should have directed a verdict for Collier.

Since there may be a retrial of this case, one other matter should be mentioned. The pleadings show that Mehrstedt admitted the allegations of the plaintiff's complaint to the effect that he was employed by Collier; hence there was no issue on that point between the plaintiff and Mehrstedt. While the plaintiff had the right to call Mehrstedt for cross-examination under section 9816, Mason's Minnesota Statutes, 1927, he being a party to the record and there being an issue between him and the plaintiff to be tried, namely, whether the plaintiff's injuries were due to his negligence, it was improper to permit her to cross-examine him as an adverse party upon the issue of his employment by Collier, since, as to that issue, he was not an adverse party. See Bachmeier v. Bachmeier, 69 Minn. 472, 72 N. W. 710; Bowler v. Fahey, 136 Minn. 408, 409, 162 N. W. 515. In the controversy with Collier over the question of whether Mehrstedt was its employee, for whose acts

it was responsible, Mehrstedt and the plaintiff were on the same side of the case.

The judgment against Collier is reversed and the case remanded for a new trial as to it.