EDMUND KASNER, d.b.a. CIVIC READING CLUB OF
MINNEAPOLIS, v. RICHARD GAGE, d.b.a. INTERNATIONAL
MAGAZINE SERVICE, AND OTHERS.
PERIODICAL PUBLISHERS' SERVICE BUREAU, INC.,
APPELLANT.

161 N. W. (2d) 40.

August 2, 1968—No. 41,076.

*Robert L. Smith* and *Feidt, Lang & Pauly,* for appellant.

*Philip John Bloedel* and *Bloedel, Sundberg, Slade, Volstad & Berry,* for respondent.

Heard before Knutson, C. J., and Otis, Sheran, Peterson, and Frank T. Gallagher, JJ.

PETERSON, JUSTICE.

Defendant Periodical Publishers' Service Bureau, Inc. (hereinafter Periodical) was adjudged liable for the acts of its agent, Richard Gage, d.b.a. International Magazine Service, (hereafter Gage) [1] in the surreptitious taking and use of the customer cards and contracts of plaintiff, Edmund Kasner, d.b.a. Civic Reading Club of Minneapolis (hereafter Kasner), notwithstanding a finding that Periodical did not know of those unlawful acts and did not ratify them. This appeal from the judgment puts in issue the responsibility of a principal for the intentional tort of an agent.

Defendant Periodical, a subsidiary of the Hearst Corporation, is a national distributor of magazines sold by various publishers. It operates its national sales activity through local franchised "dealers," who solicit installment subscription contracts from individual readers. The subscriptions so solicited are processed through Periodical's central offices in Sandusky, Ohio, and the commissions are shared between it and its franchisee. It is apparently a highly competitive business, Periodical competing with other like distributors and its so-called local franchise dealers competing with similarly engaged local solicitors. Gage was the local agent of Periodical in a franchise territory that included Minnesota. Plaintiff Kasner was a competitor of Gage, soliciting magazine service contracts in the Minneapolis-St. Paul area of Minnesota, and processing subscriptions through another national sales organization.

Plaintiff, in the conduct of his business, compiled several thousand customer cards, each showing the customer's name, address, reading preferences, credit standing, and other like information. These cards were systematically so arranged that as the customers' current contracts for magazines were about to expire plaintiff's employees could solicit a renewal of their subscriptions.

On September 14, 1964, one Robert Ball, acting on Gage's behalf, took employment with Kasner, thereby gaining access to Kasner's customer cards and service contracts. Ball, with the assistance of one Nancy Wentworth, an employee of Gage, misappropriated a large quantity of

---

[1] The direct actors in the misappropriation, Gage and certain named employees of Gage, were additional defendants in this action but have not appealed from the judgments against them.

these records and delivered them to Gage. Gage and his staff successfully solicited many of Kasner's customers and processed these subscriptions through defendant Periodical's organization. The trial court, adopting the jury's special verdict, found that the taking and use of these records were with the knowledge of Gage and that his conduct and that of Ball and Miss Wentworth were wrongful and malicious.

The trial court found, however, that defendant Periodical "did not at any of the times material to this lawsuit know of the aforesaid misappropriation and engaged in no conduct whereby it intended to deprive the plaintiff of said cards and contracts or to engage in unfair competition against him"—that, as against it, "[n]o malicious or intentional conduct has been shown in any way." These findings are fully supported by the record. The court nevertheless found and concluded that the acts of Gage were within the scope of his agency with Periodical and that it was accordingly liable vicariously.[2]

The Restatement of Agency[3] is a normative statement of principles for determining when a master or principal may be liable for the tortious or criminal acts of a servant or other agent when, as here, the principal has not actually authorized or ratified unlawful conduct. There can be no liability without a supported finding that the act was within the scope of the agency or employment, in the sense that it is "conduct * * * of the same general nature as that authorized, or incidental to the conduct

---

[2] The only interrogatory submitted for the special verdict of the jury with reference to Periodical asked: "Was defendant Richard Gage, doing business as International Magazine Service, an agent of defendant Periodical Publishers Service Bureau, Inc. *at the time he took possession of and used plaintiff's cards and contracts?*" (Italics supplied.) It was answered in the affirmative.

[3] Both plaintiff and defendant cite the Restatement as basic authority. Our own cases customarily have cited this authority, and differences in these decisions tend to reflect more a difference of fact than of controlling principle. See, for example, Larson v. Fidelity Mutual Life Assn. 71 Minn. 101, 73 N. W. 711; Barrett v. Minneapolis, St. P. & S. S. M. Ry. Co. 106 Minn. 51, 117 N. W. 1047; Rudd Lbr. Co. v. Anderson, 161 Minn. 353, 201 N. W. 548; Frankle v. Twedt, 234 Minn. 42, 47 N. W. (2d) 482; Laurie v. Mueller, 248 Minn. 1, 78 N. W. (2d) 434; Porter v. Grennan Bakeries, Inc. 219 Minn. 14, 16 N. W. (2d) 906; Plotkin v. Northland Transp. Co. 204 Minn. 422, 283 N. W. 758.

authorized." Restatement, Agency (2d) § 229. The conduct of a servant,[4] as declared in § 228(1), is within the scope of employment if, but only if, it is the kind he is employed to perform; and, in determining whether the act is of such kind, § 229(2) states that the following are among the matters to be considered:

"(a) whether or not the act is one commonly done by such servants;

\* \* \* \* \*

"(c) the previous relations between the master and the servant;

\* \* \* \* \*

"(e) whether or not the act is outside the enterprise of the master \* \* \*;

"(f) whether or not the master has reason to expect that such an act will be done;

"(g) the similarity in quality of the act done to the act authorized;

"(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

"(i) the extent of departure from the normal method of accomplishing an authorized result; and

"(j) whether or not the act is seriously criminal."

It is obvious, as the Restatement observes, that the application of the general language of these principles to the specific facts in each case, "is a matter of degree." § 231, comment *a*. Of particular pertinence to the facts in this case is comment *a* following § 248, "Interference with Business Relations":

"\* \* \* A master who authorizes a servant to compete with others and

---

[4] A "servant" is a species of an "agent," usually an employee whose physical conduct is subject to the master's control. The particularization of this agency relationship does more particularly determine the liability of the principal-master for physical torts committed by the agent-servant and results in a difference in duties between themselves such as are prescribed by statute. We discern no differences, however, in the important considerations for determining the scope of the agency in business affairs of the nature presented in this case. The trial court likewise discerned no differences, for it submitted to the jury only the question of whether Gage was the "agent" of Periodical. See, Restatement, Agency (2d) §§ 1, 2.

to do such acts as appear to the servant to be reasonably necessary in order to make such competition effective is subject to liability to persons injured by tortious acts committed in the course of such competition if intended for the benefit of the principal or master and *if not an extraordinary or outrageous method of conducting such competition.*"[5] (Italics supplied.)

We hold, as a matter of law, that the conduct of the actors in this case was not within the scope of any employment or agency relationship with defendant Periodical.[6] The most that plaintiff's evidence would establish was that Gage was a business agent of Periodical, who was subject

---

[5] Although the acts in this case were somewhat euphemistically called "misappropriation," rather than "theft," the Restatement's comment *a* following § 231 is not without pertinence: "The fact that the servant intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result. The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, *but serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do.*" (Italics supplied.)

[6] The issue was apparently decided below as a mixed question of fact and law. The court premised Periodical's liability upon a finding that Gage was an "agent" of Periodical at the time of the misappropriation of the Kasner business records. The jury was not expressly interrogated as to whether the misappropriation was within the scope of such agency; see footnote 2. The parties themselves apparently directed their evidence primarily to that issue of status. Plaintiff's evidence and argument undertook to establish the agency relationship and, more specifically, the agency relationship of master-servant. Defendant Periodical's evidence, on the other hand, was directed toward establishing Gage as a nonagent independent contractor. The evidence and the jury's answers to the interrogatories tended to establish that Ball and Miss Wentworth were agents of Gage for whose actions Gage was liable, and the court so found. Periodical's liability was then predicated upon its own relationship to Gage. Although the evidence would support the finding of an agency relationship between Gage and Periodical, our disposition of the more crucial issue as to the scope of any such agency makes a categorical consideration of the precise relationship of the parties unnecessary.

to its considerable control. Gage used a trade name owned by Periodical and operated in a territory "franchised" to him by Periodical. Gage apparently owned his own business equipment and paid his own rent and utilities, but Periodical furnished him with his most important business forms, stationery, and sales manuals. Periodical supplied a fund of $6,000 to guarantee that subscription contracts sold by Gage would be performed; and, at least at the outset of their relationship, Periodical verified approximately 25 percent of Gage's sales to determine that they were in fact made. Periodical loaned Gage money for working capital and prohibited him from borrowing money from third persons on the security of his customer accounts. Gage was required to remit collections to Periodical each week, and his customer ledgers were prepared by Periodical. Gage, on the other hand, hired and trained his own employees, fixed their working conditions, and paid their salaries or commissions, subject only to Periodical's requirement that he deposit with it evidence of workmen's compensation insurance. Although the franchise agreement required Gage to sell $250,000 worth of magazine contracts each year, Gage was responsible for developing his own leads for prospective subscribers. Facts such as these fall short of establishing that Gage's misappropriation of a local competitor's records was within the scope of such agency.

Notwithstanding the highly competitive nature of this business or any inference that might otherwise be drawn from the nature of the relationship between Gage and Periodical, the record is utterly devoid of any indication that one of the methods of competition in this business, and more particularly in Periodical's conduct of its business, contemplated the theft by one competitor of the business records of another.[7] Their business relationship had been of recent origin; although there is some

---

[7] By paragraph 4 of the franchise agreement, Gage agreed that "all contracts shall be sold honestly and business will be conducted in an equitable and proper manner and in accordance with all applicable laws and regulations, * * * and the rules of the Central Registry of the Magazine Publishers' Association, Inc." Although the record does not specifically indicate what the rules of the Central Registry are, Periodical states, without exception by Kasner, that the Central Registry is "an independent association" of persons in the magazine sales business and that its rules constitute a code of "ethical standards in magazine sales."

indication that Gage had some relationship with Periodical in 1962, the current one had commenced in March or April 1964, only a few months before the misappropriation occurred. The quality of the act can hardly be found to be of the general nature of the sales activity authorized by Periodical or reasonably incidental to such activity. The most that could be found in support of a contrary conclusion is that Periodical did benefit from the theft to the extent of its share of the subscription profit from the misappropriated customer cards. Quite apart from the absence of any evidence that Periodical was so ethically insensitive as to affirmatively seek a profit from such an extraordinary and outrageous method of conducting competition,[8] the practical fact is that such benefit was not at Kasner's expense and the compensatory damages awarded against it far exceeded any such benefit.[9] It was not the result of any instruction or in-

---

[8] There is some indication in the record that Gage on several occasions had purchased the names and addresses of prospective magazine customers from business rivals in cases where the rival had been unsuccessful in renewing the customer's contract, for which he paid 25 cents per name. This is, of course, vastly different from misappropriating, without pretense of consent or compensation, the record of live prospects, some 25 percent of whom placed their subscription with Gage.

[9] Subscription money collected by Gage was divided as follows: Gage retained 66 percent of the subscription price and remitted 34 percent to Periodical, but Periodical in turn paid the publisher of the magazine out of its share of the proceeds. Periodical's gross profit, therefore, was something substantially less than even its 34 percent share. Kasner, who had a similar sales relationship with another national sales organization, presumably had a somewhat similar subscription-sharing formula. The compensatory damages, $20,850, adjudged to Kasner against Periodical, was identical to the amount adjudged against Gage (and Ball and Miss Wentworth). The point, therefore, is twofold: (a) All, or at least most, of the profit derived by Periodical was at the expense of its own national competitor, not Kasner; and (b) whatever the indirect benefit Periodical derived from the unlawful activity of Gage, it was far less than the benefit derived by Gage personally and, accordingly, far less than the damages awarded against it. The trial court's finding that Gage acted in the scope of his agency does not appear to have been based upon any theory of benefit or unjust enrichment, for it observed at the conclusion of the evidence that "in this case Periodical Publishers couldn't be expected to turn back to Kasner its proportion of its commission on this because Kasner wasn't entitled to it anyway."

strumentality furnished by Periodical and was plainly a departure from the normal methods authorized for the accomplishment of its business objectives. As the trial court found, Periodical had no knowledge whatever concerning Gage's unlawful activity and did not ratify it.

Reversed.