STATE of Minnesota, By Its Attorney
General, Warren SPANNAUS,
Respondent,

v.

MECCA ENTERPRISES, INC.,
Appellant.

Nos. 45799, 46346.

Supreme Court of Minnesota.

Nov. 4, 1977.

Rehearing Denied Jan. 13, 1978.

Collins & Buckley, Morley Friedman, St. Paul, for appellant.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Alan A. Held, Paul A. Strandberg, and Jean E. Heilman, Sp. Asst. Attys. Gen., St. Paul, for respondent.

Heard before ROGOSHESKE, PETERSON, and KELLY, JJ., and considered and decided by the court en banc.

KELLY, Justice.

Defendant appeals from an order of the district court enjoining it from conducting business in Minnesota without first procuring a certificate of authority to transact business in Minnesota as a foreign corporation and paying a $500 fine for failure to obtain a certificate of authority, and from employing fraudulent and deceptive practices in connection with the sale of merchandise, recruitment of sales personnel, and advertisements. Defendant also appeals from a subsequent judgment awarding a penalty of $500 for failing to procure a certificate of authority to transact business in Minnesota as a foreign corporation, a civil penalty of $1,000 for consumer fraud and false advertising, and costs and disbursements. These appeals were consolidated in the instant proceeding. We affirm.

Defendant, Mecca Enterprises, Inc. [Mecca], is incorporated and has its principal offices in Texas. It is engaged as a clearinghouse for magazine and book publishers in the United States. The sale of books and magazine subscriptions are conducted exclusively through the use of "solicitors" who canvass door-to-door and work in sales crews of between 5 and 20 individuals. The 14 to 22 crews would be managed by "contractors," who contracted with Mecca.

Sometimes a "subcontractor" would work for a contractor and manage his own crew of solicitors.

The state points to several deceptive and fraudulent practices utilized by solicitors to garner sales. A few were blatant. For example, misrepresentations would be made that a solicitor was a disabled veteran who had to sell a number of magazine subscriptions to obtain employment with the assistance of or in the Veteran's Administration. Others were more subtle. A solicitor would cast herself as a "contestant" rather than a "saleswoman" and urge the resident to vote for her by subscribing to one or more magazines. The solicitor would tell the resident that she was leading in the contest and needed only a few more votes to win a cash award or travel prize. Although a contest did exist, the contestant's proximity to victory usually did not. In addition, contractors misrepresented the method of compensation and the nature of the position of a solicitor in newspaper recruitment ads.

The state brought this civil action seeking an injunction and civil penalties for consumer fraud and false advertising, Minn.St. 325.79, subd. 1, 325.905, and 325.907, subd. 3; fraudulent recruiting practices, Minn.St. 181.64 and 181.65; and transacting business in the state without obtaining a certificate of authority, Minn.St. 303.03 and 303.20. The district court, sitting without a jury, found that the fraudulent activities of Mecca employees were attributable to Mecca under the doctrine of respondeat superior. On appeal, Mecca maintains that the contractors and solicitors were independent contractors not under its control. Both parties agree that the question of the status of Mecca's operatives also resolves the other issues raised by this appeal.

Mecca asserts that the contractors had sufficient control of their operations to be independent contractors. A contractor would hire his solicitors, negotiate their commissions individually, determine where and when they would solicit, and bear expenses. At the close of each sales day, he would "check in" his solicitors, complete a daily report form, and send the orders re-

ceived and his remittance to Mecca. His compensation from Mecca was a commission. The contractor was required to pay for subscription order forms and to pay postage on a biweekly company publication entitled "The Mecca." The contract between Mecca and the individuals themselves by its terms referred to the managers as independent contractors.

The state argues, and the district court found, many facts indicating control and direction by Mecca. For example, Mecca had the right to terminate contractors for reasonable cause and the right to require contractors to discharge solicitors with or without cause. It informed managers of complaints received from consumers or publishers and suggested when remedial action was required. It also sponsored sales contests among the solicitors. The contests had the effect of increasing or decreasing sales of certain magazines, depending on the points Mecca awarded for their sale. By furnishing the solicitor with an identification card verifying his participation in the contest and a magazine list indicating the points each magazine was worth in the contest, Mecca determined the form of sales pitch used by the solicitor.[1] It also influenced the manner of payment through provision of order forms. The biweekly bulletin, "The Mecca," informed solicitors of their standing in contests and exhorted them to increase sales. Mecca forwarded mail to people in the field and also informed them of price or term changes in magazine subscriptions. It also prohibited them from soliciting magazines for other clearinghouses and attempted to collect amounts due from customers on mail-in orders.

In addition, the crews in the field did not lead isolated existences. Many were mutually interdependent and supportive, occasionally engaging in joint traveling, training, recruiting, lodging, planning, and allocation of sales territory. Mecca's president, Joe Edge, was himself a contractor and participated in these joint activities. There is some controversy about the significance to be attached to Edge's presence at inter-crew meetings. Mecca asserts he participated as would any other contractor, but there was contrary testimony from former solicitors that the district court might credit. The vice-president of the corporation, Alma Laney, also participated in recruiting solicitors through classified advertisements.

Whether a salesman in a particular situation can be characterized as an independent contractor or agent is a question of fact. Primarily, courts will deem a salesperson an employee of one who has the right to exercise control over the manner of the sale and to direct the result to be accomplished. E. g., *Singer Mfg. Co. v. Rahn*, 132 U.S. 518, 10 S.Ct. 175, 33 L.Ed. 440 (1889); *Angell v. White Eagle Oil & Ref. Co.*, 169 Minn. 183, 210 N.W. 1004 (1926). See, Annotation, 98 A.L.R.2d 335 (house-to-house salesman or canvassing crews); Annotation, 55 A.L.R.3d 1216 (news carriers); Annotation, 126 A.L.R. 1120 (subscription salesman on commission). See, generally, Restatement, Agency 2d, § 220. In *Geerdes v. J. R. Watkins Co.*, 258 Minn. 254, 262, 103 N.W.2d 641, 646 (1960), we noted:

> " * * * In a large measure each case must be determined on its own facts. The distinction between an employee and an independent contractor may be said to consist largely in the difference between one who undertakes to achieve a given result under an arrangement with another who has authoritative control over the manner and means in which and by which the result shall be accomplished and one who agrees to achieve a given result but is not subject to the orders of another as to the method or means to be used."

The instant fact situation presents a close question, and some courts might find that an independent contractor relationship inheres in Mecca's structure of operations. *P. F. Collier & Son Co. v. Hartfeil*, 72 F.2d 625 (8 Cir. 1934); *Bond v. Harrel*, 13 Wis.2d 369, 108 N.W.2d 552 (1961).

---

1. Indeed, the language of the sales pitch might be attributed to Mecca indirectly through inter-crew meetings and training sessions conducted by Mecca. A written copy of the "contest sales presentation" was circulated in many of the crews.

In the present case, the finding of the district court that the contractors and solicitors were employees may be reversed only if clearly erroneous. See, Rule 52.01, Rules of Civil Procedure; *In re Estate of Balafas*, 293 Minn. 94, 96, 198 N.W.2d 260, 261 (1972). Mecca maintains that our decision in *Speaks, Inc. v. Jensen*, Minn., 243 N.W.2d 142 (1976), is dispositive. There, the question was whether door-to-door vacuum cleaner dealers were employees for purposes of the Minnesota law governing unemployment compensation. The court in describing the dealer's occupation stated:

" * * * The dealer agreement may be terminated at any time by either party.

"The dealers are free to establish the principal incidents of their sales activities. They are not required to work specific hours or days or any number of hours or days. They are not assigned or limited to a particular territory. *They are free to sell any other products including those of competitors.* They may employ assistants but are solely responsible for their compensation.

"*The dealers are compensated on a profit basis. They may sell the cleaners at any price* but are obligated to Speaks for the wholesale price of the machines. * * *

"Dealers generally work out of their homes. Speaks does not provide offices, desk space, or business phones. It does not pay any of the dealers' expenses, nor does it make advances. It does not carry liability insurance on the automobiles used by the dealers or withhold social security or income tax for them." Minn., 243 N.W.2d 144. (Italics supplied.)

In that case, we affirmed the holding of the district court that the relationship between Speaks and its dealers lacked the degree of control necessary to create a relationship of employer and employee under the Minnesota unemployment compensation statutes.

Admittedly, *Speaks* parallels the instant case in many respects. However, two facts distinguish the cases. In *Speaks,* the dealers could sell competitor's products and could sell the vacuum cleaners for whatever price they chose. Mecca's operatives, on the other hand, could solicit subscriptions only through Mecca and were compensated on a commission basis, thus connecting them more directly to Mecca's operation. See, *Corbin v. Commr. of Revenue,* 307 Minn. 237, 240 N.W.2d 809 (1976).

The situation of Mecca's representatives has parallels also in *Boland v. Morrill,* 270 Minn. 86, 132 N.W.2d 711 (1965), where we found sufficient evidence to sustain a jury's determination that a traveling salesman was an employee. The salesman there sold farm equipment under two arrangements. Like the dealers in Speaks, he could buy equipment and resell it to his own customers at any price he desired. But he would also sell to the manufacturer's own dealers on a commission basis, and it was found that with respect to these sales the salesman could reasonably be characterized as an employee, even though he had no quota or minimum hours, furnished his own vehicles, and was not reimbursed for his expenses. But unlike Mecca, the company that manufactured the farm equipment included the salesman as an employee on worker's compensation forms, withheld state and Federal income taxes from his commission payments, and deducted his share of his social security tax.

In the instant case, we cannot say with a definite and firm conviction that the trial judge erred in finding an employer-employee relationship. *In re Estate of Balafas, supra.* Neither the parties' own characterization of their relationship, *Edelston v. Builders and Remodelers, Inc.,* 304 Minn. 550, 229 N.W.2d 24 (1975), nor the failure of the company to withhold income and social security taxes, *Duetsch v. E. L. Murphy Trucking Co.,* 307 Minn. 271, 275, 239 N.W.2d 462, 465 (1976), is determinative. Mecca exercised sufficient control over its field representatives to be denominated their employer. Furthermore, the acts found to be in violation of the statutes were committed within the scope of Mecca employment.

Affirmed.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

Considered and decided by the court en banc.

### UPON PETITION FOR REHEARING

KELLY, Justice.

■ It was claimed in the petition for rehearing that this court erred in stating that the parties agreed that "the question of the status of Mecca's operatives also resolves the other issues raised by this appeal." This quote should be read in the context of the opinion as a whole and especially in connection with the statement in the opinion that "the acts found to be in violation of the statutes were committed within the scope of Mecca employment." Defendant attempts to equate this case with *Kasner v. Gage*, 281 Minn. 149, 161 N.W.2d 40 (1968). In *Kasner* it was held that a principal was not responsible for the intentional tort of its agent where it did not know of the unlawful acts and did not ratify them. In the instant case the trial court found that "Mecca had control over, knowledge of, and derived monetary benefit from the misrepresentations and deceptive practices." Other findings are tantamount to a finding that Mecca ratified the fraudulent sales practices. Mecca was notified of them by customers and nonetheless retained the benefits of the sale. Thus, *Kasner* has no application here.

The central issue in this case is whether the solicitors were employees of Mecca and if so, whether the deceptive and fraudulent sales practices were done within the scope of their employment. All of the issues raised by Mecca and the authorities cited by it in this appeal were considered by this court, but were not discussed in our opinion, not only because it was generally agreed in the oral arguments that this central issue would be decisive of all other issues, but also because that was obviously so in light of all the other facts and circumstances.

Counsel for Mecca in his oral argument stated:

"The issues I believe can be summarized as follows. Does this court, the courts of Minnesota, have jurisdiction over this foreign corporation under either the corporate long-arm statute or the long-arm statute requiring the transaction of business within the state as a prerequisite? The second issue is whether Mecca, as a company that transacts business exclusively through the channels of interstate commerce, is it subject to the requirements under Minn.St. 303.03 that a foreign corporation must have a certificate of authority as a prerequisite to doing business in Minnesota? And finally, can Mecca be held liable for the purportedly fraudulent sales practices of solicitors retained by independent contractors? *Each of these issues, I believe, must ultimately be resolved by reference to the issue of the relationship between Mecca and the individuals who committed the acts complained of.* In other words, there is no jurisdiction over Mecca if the acts committed in Minnesota were not performed on behalf of Mecca and, likewise, there is no basis to require Mecca to obtain a certificate of authority to do business .in the state of Minnesota if it does not in fact transact business in the state through these independent contractors and does not transact business in the state at all other than through the mails. And finally, Mecca cannot be held liable for the acts of persons with whom it has no employment or agency relationship."

Counsel for the state stated:

"* * * I would like to discuss the issues of the case as the State of Minnesota views them. There are two basic issues actually that underline the whole case. The first issue goes to the sufficiency of the evidence and the second issue goes to Mecca's responsibility for the conduct of its personnel. Concerning the first issue, the court obviously held that there was sufficient evidence adduced at trial to support its findings. Concerning the second issue of Mecca's responsibility, if, as the trial court found,

Mecca is accountable for the acts of its personnel, then the other issues set forth in the state's brief, and there are three other issues, naturally follow. And those issues are that Mecca is responsible for the fraudulent conduct and the deceptive selling and hiring practices of its personnel and its crew managers; then, Mecca also transacted business in the State of Minnesota and therefore is required to register with the secretary of state as a foreign corporation; and, finally, if Mecca is responsible for these acts, then Minnesota courts have jurisdiction over Mecca Enterprises."

 We did not discuss in the opinion Mecca's claim that requiring it to obtain a certificate of authority to transact business in this state as a foreign corporation unconstitutionally infringed upon interstate commerce because it seemed to be conceded that if the solicitors were Mecca employees then Mecca had been transacting business in this state so as to require a certificate of authority. The fee charged for such a certificate is nominal. Therefore, a claim that it is a burden can hardly be sustained. The Supreme Court of the United States spoke favorably of it in *Union Brokerage Co. v. Jensen,* 322 U.S. 202, 209, 64 S.Ct. 967, 972, 88 L.Ed. 1227, 1232 (1944):

"But the Commerce Clause does not cut the States off from all legislative relation to foreign and interstate commerce. * *

"The information here sought of all foreign corporations by Minnesota as a basis for granting them certificates to do business within her borders is a conventional means of assuring responsibility and fair dealing on the part of foreign corporations coming into a State. Apart from any question of interference with foreign commerce such a requirement is plainly within the regulatory power of a State. * * * The burden, such as it is, falls on foreign businesses that commingle with Minnesota people, and the burden, a fee of fifty dollars, is sufficiently small fairly to represent the cost of governmental supervision of foreign business enterprises coming into Minnesota. In short, it is a supervisory and not a fiscal

measure. As such it imposes costs upon the State which those who are supervised must, as is often the case, themselves pay. * * *

\* \* \* \* \* \*

"The Commerce Clause does not deprive Minnesota of the power to protect the special interest that has been brought into play by Union's localized pursuit of its share in the comprehensive process of foreign commerce."

 While the bare fact that the solicitors here were employees would not necessarily require a finding that Mecca was doing business in the state, the other facts and circumstances present in this case as found by the trial court adequately support its finding that Mecca transacted business within the state.

The petition for rehearing is denied.