**ROSENTHAL & COMPANY, Petitioner,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

No. 85–2053.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1986.

Decided Oct. 3, 1986.

Rehearing and Rehearing En Banc Denied Nov. 3, 1986.

Ralph A. Mantynband, Arvey, Hodes, Costello & Burman, Chicago, Ill., for petitioner.

Susan Ervin, Commodity Futures Trading Com'n, Washington, D.C., for respondent.

Before BAUER, Chief Judge, and WOOD and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This petition by Rosenthal & Company, a commodities broker, to review an order of the Commodity Futures Trading Commission requires us to decide questions of the interpretation and application of section 2(a)(1) of the Commodity Exchange Act, 7 U.S.C. § 4. That section provides that "the act, omission, or failure of any official, agent, or other person acting for [an entity regulated by the Commodity Futures Trading Commission] within the scope of his employment or office shall be deemed the act, omission, or failure of" the entity itself.

In 1974 and 1975 Larry Pinckney and others organized three corporations to operate, among other types of investment venture, commodity pools. A commodity pool is the commodity-futures equivalent of a mutual fund; the investor buys shares in the pool and the operator of the pool invests the proceeds in commodity futures. See 1 Johnson, Commodities Regulation § 1.15, at pp. 52–53, §§ 1.59–1.64 (1982). Pinckney, the president of two of the three corporations, marketed shares in the pools through salesmen hired by the corporations. His office was on the first floor of an office building in Kansas City.

To trade commodity futures for the pools Pinckney had to use a commodities broker registered on the major commodity exchanges, such as Rosenthal & Company—a "commission house," as this kind of broker is sometimes called, see H.R.Rep. No. 975, 93d Cong., 2d Sess. 140–43 (1974). Rosenthal was eager for Pinckney's business, and by way of inducement was willing to rebate to him part of its regular commission for trading commodity futures. But Rosenthal could not lawfully split commissions with Pinckney unless Pinckney was registered with the commodity exchanges. See 1 Johnson, *supra*, § 1.89, at 197. One way of accomplishing this was for Rosenthal to register Pinckney with the Commodity Futures Trading Commission as an "associated person" of Rosenthal, 7 U.S.C. § 6k, and then designate him a registered representative of Rosenthal with the exchanges. Rosenthal took these steps. It also designated Pinckney its Kansas City branch manager, and leased office space for him on the tenth floor of the building that contained Pinckney's office as president of the two investment corporations on the first floor. Pinckney did not, however, become an employee of Rosenthal. He was compensated not by a wage but by rebates of commissions that Rosenthal charged the pools for executing their trades. In return

Pinckney agreed to give Rosenthal the pools' brokerage business.

■ Pinckney's relationship with Rosenthal began late in 1975 and ended in 1978. There is evidence that during this period Pinckney sometimes told the salesmen for his commodity pools not to send investors the actual subscription agreement (i.e., the contract for the purchase of shares in the pool) until the investor had mailed his check, because the agreement contained alarming language (required by the Commodity Futures Trading Commission) about how risky speculation in commodity futures is. There was not a great deal of such evidence but enough to sustain the Commission's conclusion, in the proceeding we are asked to review, that Pinckney had engaged in a form of commodities fraud, in violation of sections 4b and 4o of the Commodity Exchange Act, 7 U.S.C. §§ 6b, 6o. The difficult question is whether the Commission was entitled to impute Pinckney's conduct to Rosenthal under section 2(a)(1). Rosenthal argues that it was not, and that therefore we must set aside the Commission's order, which imposed a $15,000 fine on Rosenthal for Pinckney's violation.

■ Section 2(a)(1), which dates back to 1921, enacts a variant of the common law principle of respondeat superior. The common law principle makes an employer strictly liable—that is to say, regardless of the presence or absence of fault on the employer's part—for torts committed by his employees in the furtherance of his business; in legalese, it "imputes" the employee's negligence to his employer, thus making the employer's own lack of fault immaterial. See Prosser and Keeton on the Law of Torts § 70 (5th ed. 1984). Section 2(a)(1) departs from the common law in two respects. It is in effect a quasi-criminal statute as well as a tort statute, for it can make the principal liable for not only the payment of damages to the victim of the tort (the statutory tort of commodities fraud) but also the payment of a fine to the government. And it applies to torts committed by agents who are not necessarily employees. The resemblance to the tort doctrine is so close, however, and the language of the statute so clear—it expressly imputes the agent's wrongdoing to the principal—that we have no doubt that section 2(a)(1) imposes strict liability on the principal (Rosenthal), provided, of course, as the statute also states expressly, that the agent's misconduct was within the scope or (equivalently but more precisely) in furtherance of the agency.

■ Principals are strictly liable for their agents' acts—even if the agents are not employees—if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized. This is so even though in a case of ratification or apparent authority the principal does not himself direct the act and may indeed know nothing about it when it occurs, as Rosenthal (we may assume) knew nothing of Pinckney's fraud. Ratification is not the theory of section 2(a)(1), but we mention it to show that strict liability is no stranger to the principal-agent relationship even outside the narrow domain of the employment relationship. Strict liability is no stranger to the criminal law either, and anyway, technically at least, section 2(a)(1) is not a source of criminal liability— though, functionally speaking, a fine is a fine. Although there is no pre-enactment legislative history of section 2(a)(1) and no extended judicial discussions, it has long been assumed, and for the reasons stated we agree, that the statute was intended to impose strict liability, under a theory of respondeat superior, for acts within its reach. See, e.g., *CFTC v. Premex, Inc.*, 655 F.2d 779, 784 n. 10 (7th Cir.1981); H.R. Conf.Rep. No. 964, 97th Cong., 2d Sess. 48 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3871, 4066.

Rosenthal argues, however, that later additions to the Commodity Exchange Act must be taken to have modified the strict-liability standard of section 2(a)(1). Section 13(a), 7 U.S.C. § 13c(a), imposes liability for aiding and abetting violations of the Act; section 13(c), 7 U.S.C. § 13c(c), imposes liability on "controlling persons," that is, persons controlling the violator. The legisla-

tive history makes plain, however, that these additions were intended to supplement rather than displace the respondeat superior liability created by section 2(a)(1). See H.R.Conf.Rep. No. 964, *supra*, at 48, U.S.Code Cong. & Admin.News 1982, p. 4066; S.Rep. No. 384, 97th Cong., 2d Sess. 47 (1982). The same conclusion has been reached in interpreting the "controlling person" provisions of the federal securities laws—section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)—on which section 13(c) of the Commodity Exchange Act is modeled, S.Rep. No. 384, *supra*, at 47. See, e.g., *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1114–19 (5th Cir. 1980); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 711–16 (2d Cir.1980). These holdings have been criticized, see Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934*, 69 Calif.L.Rev. 80, 86–87, 89–94 (1981); cf. *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494–95 (7th Cir.1986), but on grounds unrelated to the present case. For there is no counterpart in the securities laws to section 2(a)(1) of the Commodity Exchange Act, that is, no provision creating liability on the basis of respondeat superior. And, again unlike that Act, there is no legislative history to the securities laws clearly indicating that the "controlling persons" provisions are intended to leave respondeat superior unaffected.

■ Nor does an aiding or abetting provision or a controlling-persons provision occupy the same ground as respondeat superior, so that the three grounds of liability cannot co-exist. Section 2(a)(1) would not, for example, reach the case of an aider or abettor who was not the violator's principal. Nor would it reach an individual officer or supervisor who controlled the violator. The words "respondeat superior" imply that the doctrine is one of superior officers' liability, but it isn't; it is a doctrine about employers and (in section 2(a)(1)) other principals. It has no application to a case where A, B's supervisor, is sued because B commits a tort. There is, in fact, no common law doctrine of superior officers' liability. *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1390 (7th Cir.1984). Although a supervisor could of course be held liable by reason of his personal fault, see *id.* at 1391; *Chapman v. Pickett*, 801 F.2d 912, 918, (7th Cir.1986); *id.* at 926 (dissenting opinion), that would not be by virtue of respondeat superior, a doctrine of imputed liability. Section 13(c), however, creates superiors' liability in or approximating a respondeat superior sense in the commodities trading industry. More important, section 13(c) makes it more difficult for a principal to escape liability by inserting a dummy corporation between itself and its agent. See S.Rep. No. 384, *supra*, at 47; cf. *Paul F. Newton & Co. v. Texas Commerce Bank*, *supra*, 630 F.2d at 1115. Of course common law principles would allow the corporate veil to be pierced and the shareholder of the dummy corporation (i.e., the real principal) held liable for the agent's misconduct. But these principles are rather nebulous, see, e.g., *In re Kaiser*, 791 F.2d 73, 75 (7th Cir.1986), federal common law tends to be ill defined, and Congress apparently wanted a more straightforward route to making principals liable for their agents' wrongdoing.

■ So the fact that Rosenthal was not shown to know about or be involved in or careless regarding Pinckney's fraud is irrelevant; the only question is whether the fraud was within the scope of his agency. This, however, is a difficult question, though *CFTC v. Commodities Fluctuations Systems, Inc.*, 583 F.Supp. 1382, 1384 (S.D.N.Y.1984), aff'd without opinion, 788 F.2d 4 (2d Cir.1986), provides a bit of support for the Commission's answer, and no case is against it. The fraud was committed by Pinckney in soliciting customers for his commodity pools, and Rosenthal contends that Pinckney was its agent not to solicit investors in commodity pools but to steer commodity brokerage business its way. Indeed, Rosenthal questions whether Pinckney was an agent in any but a technical sense. It says he really was a custom-

er, who bought brokerage services from Rosenthal; and because he was a good customer, Rosenthal agreed to give him (in effect) a discount off the price of those services. But to do this lawfully, Rosenthal argues, it had to make him an "associated person" of Rosenthal and a registered representative of the commodities exchanges. Because the rules of those exchanges require that all exchange business be done in offices exclusively dedicated to such business, Rosenthal also had to set up Pinckney in his tenth-floor office, yet so far as appears none of the customers for the commodity pools was even aware of the office. Pinckney's status as an associated person authorized him to solicit business on Rosenthal's behalf, but there is no indication he did so. As a matter of fact it would have been unlikely for him to do so. Rosenthal appears to have had no interest in having Pinckney's customers as customers for its brokerage business. It was content to have them as indirect customers, in the sense that Pinckney's brokerage business with Rosenthal depended on his success in attracting investors to his pools.

■ This is a good line of argument and if the Commission had accepted it we don't suppose that we or any other court would think the Commission had taken leave of its senses. But we also think the Commission was entitled, without being deemed to have acted unreasonably or without substantial evidence, to conclude that Pinckney was acting within the scope of his agency when he instructed his salesmen to delay in sending investors the subscription agreement. Rosenthal did not have to make Pinckney a branch manager, and lease an office for him, in order to be able to compensate him, by splitting commissions, for the brokerage business that he gave it. All that was required was that Pinckney· register with the commodities exchanges. See 1 Johnson, *supra,* §§ 1.44, 3.15. To do this on his own he would have had to put up some capital. By becoming an associated person he was able to use Rosenthal's capital, but nothing in the law required Rosenthal to put up the money for his registration, let alone to pay for the office that Pinckney

was required to have for his exchange activities or to make Pinckney a branch man· ager.

Rosenthal did all this in the hope that Pinckney would generate more brokerage business for it by vigorous solicitation of investors for his commodity pools. Rosenthal knew about the pools and must have known that it was encouraging Pinckney to continue and if possible augment the solicitations that had brought the existing investors into these pools. One of Rosenthal's executives described Pinckney as a "salesperson" for Rosenthal. The subscription agreements, which were reviewed and approved by Rosenthal, described Pinckney as "a commodity solicitor with Rosenthal & Company, the futures commission merchant through which the [commodity pool] will execute most of its trades." The fact that the fraud consisted of delaying the sending of these agreements to the investors does not detract from their significance in characterizing the relationship of Pinckney and Rosenthal as Rosenthal itself viewed it. Rosenthal apparently thought of Pinckney's customers as its indirect customers and Pinckney as its solicitor of these indirect customers.

■ Rosenthal argues that there was no way in which it could have policed Pinckney's solicitations and thereby prevented the fraud. In so arguing it appeals to the policy behind respondeat superior. That policy is to encourage employers and other principals to monitor the conduct of their often judgment-proof (or fine-proof) employees. See *Anderson v. Marathon Petroleum Co.,* 801 F.2d 936, 938–40 (7th Cir.1986). But Rosenthal takes too narrow a view of monitoring. It could not practicably have assigned someone to make himself Pinckney's shadow and give a shout whenever he saw Pinckney committing a fraud, but it could have investigated Pinckney's operation before signing him on, and after signing him on could have conducted discreet spot checks of the operation from time to time. We do not say it was careless in failing to do more than it did, because there is no proof that it was. But

negligence is not required for respondeat superior. Liability under the doctrine is strict, in the belief that employers and sometimes other principals can in the general run of cases prevent torts committed by their employees or agents in furtherance of the employment or agency. The belief does not have to be substantiated in every case.

We do not rest decision on the fact that Rosenthal benefited from Pinckney's fraud because the fraud increased the number of trades that Rosenthal executed. As a matter of fact it is by no means clear that the fraud did lead to additional investment in the commodities pools. The fraud was of a highly technical sort that cannot be presumed to have had an effect, and no attempt was made to prove an effect. But even if Rosenthal had benefited from the fraud, the theory under which it was fined was respondeat superior, not unjust enrichment; and the fact that A benefits from B's activities does not make B A's agent. If A sells plastic cards to B which B makes into burglar tools, A is liable if at all for B's misconduct as an aider and abettor, not as a principal. But if A sets up B as its branch manager for the sale of plastic cards, characterization as an agency may become possible; and there were enough facts here to allow the Commission to adopt that characterization of the relationship between Pinckney and Rosenthal.

■ Some deference must be paid to the special knowledge which the Commission brings to the regulation of the commodities markets. The ascription of agency is a purposive, policy-oriented act rather than an exercise in semantics. The Commission has deemed Pinckney an agent of Rosenthal in soliciting investors through fraudulent means not because the words "within the scope of his employment or office" ineluctably compel the conclusion that Pinckney's agency included solicitation but because the words allow this interpretation and the interpretation may reduce the amount of fraud in the sale of commodity future contracts, whether directly or through commodity pools. Commodities brokers will be more careful about whom they, grasp to their bosoms as branch managers and commodity solicitors and this will be (or so the Commission is authorized to conclude) all to the good. It is true that by making a few changes in its relationship with Pinckney Rosenthal might have put itself outside the reach of section 2(a)(1); and maybe the principal effect of the Commission's decision will be to induce commodities brokers to maintain just a slightly longer arm's length relationship with solicitors such as Pinckney, rather than to supervise them more closely. But such unintended consequences are for the Commission to worry about. It had a reasonable if not compelling basis for deeming Pinckney's acts to be within the scope of the agency created by Rosenthal, and no more is required to compel us to uphold the Commission's order.

■ The procedural issues raised by Rosenthal are trivial, without merit, and do not merit discussion; administrative agencies even when meting out fines are not required to comply with every procedural punctilio required of courts.

AFFIRMED.