**ANSPACHER & ASSOCIATES, INC., a corporation,
Plaintiff–Counter–Defendant–Appellant,**

v.

**Wayne HENDERSON, Individually, and d/b/a Electric Service Company, Defendant–Counter–Plaintiff–Appellee.**

No. 86–2464.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1987.

Decided July 29, 1988.

Rehearing Decided Aug. 30, 1988.

Thomas M. Knepper, Neal, Gerber & Eisenberg, Chicago, Ill., for plaintiff-counter-defendant-appellant.

Thomas O. Kuhns, Kirkland & Ellis, Jeffrey D. Schultz, Ltd., Chicago, Ill., for defendant-counter-plaintiff-appellee.

Daniel S. Goodman, Washington, D.C., for amicus curiae Commodity Futures Trading Commission.

Before WOOD, Jr., POSNER and MANION, Circuit Judges.

MANION, Circuit Judge.

A commodities futures brokerage house sued a former customer under Illinois law to recover the balance due on the customer's futures trading account. The customer responded that the broker handling his account had engaged in unauthorized trading, and that the broker then ignored his protests, leading to compensable losses and the debit balance. The brokerage house replied that had the customer timely notified it directly of the unauthorized trades, as the customer had agreed to do, instead of first waiting to see the results of those trades, then it could have taken steps to cancel the unauthorized trades, and the customer would have sustained limited losses.

A jury returned a verdict for the customer, and the district court denied the brokerage house's motion for judgment notwithstanding the verdict. Because we cannot hold as a matter of Illinois law that the brokerage house's own subsequent conduct did not serve to modify the original notification agreement, we do not overturn the jury's verdict. We do, however, reduce the amount of the damages awarded, which were excessive.

## I. NATURE OF THE CASE

Plaintiff-appellant Anspacher & Associates, Incorporated (Anspacher), a commodities brokerage house based in Chicago, is a "futures commission merchant" within the meaning of Section 2(a)(1)(A) of the Commodity Exchange Act ["Act"], 7 U.S.C. § 2. Jon Jensen was a registered commodity representative and a broker in Anspacher's Minot, North Dakota office. Jensen was registered with the Commission as an "associated person" of Anspacher's. An associated person is a futures commission merchant's employee who solicits or accepts customer orders. 17 C.F.R. § 1.3(a); § 4k of the Act, 7 U.S.C. § 6k.

On January 10, 1983, defendant-appellee Wayne Henderson, individually and doing business as Electric Service Company (Henderson), opened an account with Jensen in Minot to trade commodity futures contracts. Henderson is an electrician who lives in Minot. While Henderson referred to himself at trial as "a naive country boy," and he had no previous experience in futures trading, he is a self-made millionaire.

Henderson deposited $20,000 into the account to start and subsequently added at other times $7,350, for a total of $27,350. The account was non-discretionary; Jensen could not establish new positions without first obtaining Henderson's permission.

Before opening his account, Henderson signed the Customer's Agreement (Agreement). The Agreement was a two-page form prepared by Anspacher. At the top of the first page of the Agreement, set forth in italics, was the following exhortation: *"This is an important document which should be read before signing."*

Section V, the notification provision, informed Henderson that written confirmations of trades would be binding unless he objected directly to Anspacher's Chicago headquarters within five days after receipt. Section V (in which "you" refers to Anspacher and "me/I" refers to Henderson) provided in pertinent part as follows:

> Reports of executions of orders, as reflected in your written confirmations, shall be conclusively deemed received by me not later than 5 postal business days

after the date of such confirmation, whether actually received by me or not. Such confirmations shall be deemed conclusive of your authority from me to execute such transaction if not objected to by me on the earlier of the date made reference to in the immediately preceding sentence or the date of actual receipt by me. Such objection shall be made orally to one of your officers in Chicago, Illinois, and forthwith confirmed by mailgram or telegram to your Chicago office. This provision shall act to protect you from an untimely or misdirected assertion by me of a lack of authority to you or other impropriety with respect to any such transaction.... I will similarly notify you as set forth above if, within 5 postal business days, I have not received your confirmation of a transaction ordered by me for my account.

The Agreement also provided in its modification provision that only Anspacher's president or executive vice-president could amend or modify the Customer's Agreement, and that waiver of any provision had to be negotiated with one of those two individuals. In the final pretrial order, Henderson stipulated that he "knowingly signed Anspacher's Customer's Agreement."

In the beginning of February, 1983, Henderson went to Arizona for a vacation. On Monday, February 14, 1983, Henderson, who was closely following the commodities markets from Arizona, telephoned Jensen and ordered him to sell all the open positions in his accounts. Instead, on Wednesday, February 16, Jensen purchased two May New York Silver contracts. This purchase ultimately led to a $42,100 loss. Jensen also made several other unauthorized trades—each the purchase of a long position in gold or silver—on or before Thursday, February 17.

Henderson testified that when he returned to Minot sometime during the weekend of Saturday, February 19 through Monday, February 21, he reviewed his confirmation statements and realized that Jensen had not liquidated his account. Each confirmation sent to Henderson (presum-

ably from Anspacher in Chicago) stated in the lower right-hand corner as follows:

> Please report any differences immediately. The failure to immediately exercise your right to have errors corrected will be deemed your agreement that this statement is correct and ratified.

By Tuesday morning, February 22, Henderson called Jensen to complain. Henderson further testified that on two subsequent occasions he ordered Jensen to liquidate the account as soon as possible and that Jensen promised he would.

Henderson admitted that he complained only to Jensen, his account executive in the branch office, and that he never complained to Anspacher's Chicago headquarters as the Agreement required. Henderson further admitted that he never formed an opinion or belief as to whether Jensen would communicate his protests to Anspacher's Chicago office, but that he was relying on Jensen's assurance that any problems could be handled by the Minot office, for "Jensen had instructed me and told me that any problem we had he could deal with through the Minot office." Jensen admitted at trial that he had asked Henderson to contact him with any complaints and that he had never advised Henderson to contact Chicago.

It is undisputed that Anspacher was not and could not have been aware of Jensen's unauthorized trading. When Jensen did finally liquidate the account on March 1, 1983, the prices of gold and silver had dropped in the interim, and the account had a debit balance of $28,440.61. It is undisputed that if Henderson had notified the Chicago office on the morning of February 22, by which time he knew exactly what Jensen was doing with his account and had already called Jensen to complain, then he would now have no debit balance and would have received back—after deducting all commissions—all the money he had deposited.

## II. NATURE OF THE PROCEEDINGS

Anspacher sued Henderson for breaching the Agreement. Anspacher sought to recover the balance due on Henderson's commodities trading account of $28,440.61.

Henderson answered, essentially admitting the factual allegations in Anspacher's complaint that the money was owing. Henderson, however, denied liability and filed a counterclaim against Anspacher. In the counterclaim, Henderson alleged, and it is undisputed, that Jensen executed several unauthorized trades for Henderson's account and failed to timely implement Henderson's instructions to liquidate. Because Anspacher is vicariously liable for Jensen's acts, Henderson charged in relevant part that Anspacher violated the Act, 7 U.S.C. § 6b, and that Anspacher breached its fiduciary duty to Henderson. Henderson sought $31,403.35 as damages, the amount in his account on February 15, 1983. Anspacher's reply to Henderson's counterclaim in turn denied liability and asserted various affirmative defenses, including ratification and estoppel.

Anspacher moved for partial summary judgment on the ground that Henderson without justification failed to comply with the notification provision (with the only remaining issue then to be Anspacher's request to recover its attorney's fees, pursuant to the Agreement). The district court denied this motion on the grounds that genuine issues of material fact "revolve around the conduct and behavior of the parties and whether the terms of the agreement prevail." Anspacher subsequently filed a motion *in limine* to exclude Henderson's explanations for his failing to comply with the notification provision, in particular evidence regarding Jensen's misrepresentations and conduct. The court denied that motion as well.

A jury trial was held. Among the affirmative defenses submitted to the jury were ratification and estoppel, in accordance with Anspacher's proposed instructions. The jury returned a verdict in favor of Henderson and against Anspacher on Anspacher's complaint. The jury then returned a verdict in Henderson's favor on his counterclaim and awarded compensatory damages to Henderson of $60,000. The jury did not award punitive damages. An-

spacher moved for a judgment notwithstanding the verdict, the district court denied that motion, and Anspacher appeals.

### III. ANALYSIS

■■■ Anspacher no longer disputes that Jensen made unauthorized trades. Anspacher admits that Jensen's failure to liquidate Henderson's positions upon his request constitutes unauthorized trading and thus statutory commodities fraud. By knowingly failing to follow Henderson's instructions to close out his account, Jensen violated § 4b of the Act, 7 U.S.C. § 6b, *see Cange v. Stotler and Company*, 826 F.2d 581, 589 (7th Cir.1987); *Clarke v. Shearson Lehman/American Express, Inc.*, [1984–1986] Comm.Fut.L.Rep. (CCH) ¶ 22,746 at 31,112 (CFTC 1985). Under § 2(a)(1) of the Act, 7 U.S.C. § 4, Anspacher is strictly liable for Jensen's fraud. *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir.1986); *Cange, supra*, 826 F.2d at 589. In addition to its obligations under the Act and under the Agreement, Anspacher also owed a fiduciary duty to its customer to execute faithfully his orders. *See United States v. Dial*, 757 F.2d 163, 168 (7th Cir.), *cert. denied*, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985).

■■■ Anspacher nonetheless argues that compliance with the Agreement's notification provision is a condition precedent to a customer's recovery and thus, as a matter of law, Henderson's failure to comply with the provision bars his recovery for damages he sustained after February 22, no matter what Anspacher's liabilities under any law would otherwise be.

In general, parties may agree as to what specific methods will constitute effective notice. If a party breaches the notification provision, then it cannot recover damages that would have been avoided had it complied with the provision. *See* 6 Williston on Contracts, § 887B at 513–14 (3rd ed. 1962). The parties agree that the notification provision is enforceable and valid. Henderson does not assert that it is void or voidable. There is nothing in the notification provision that violates the Act. *See Cange,*

*supra*, 826 F.2d at 596 (Easterbrook, J., concurring).

The agreed-upon condition that Henderson send notice to Anspacher's Chicago office of his objection to any trade is eminently reasonable. As a matter of practice, "complaints about errors are virtually always made in the first instance to the account executive." *Stoller v. Siegel Trading Co.*, [1984–86] Comm.Fut.L.Rep. (CCH) ¶ 22,224 at 29,208 (CFTC 1984); *see Keller v. Scoular–Bishop of Missouri, Inc.*, [Current Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶ 23,128 at 32,336 (CFTC 1986). The notification provision in the Agreement addresses precisely the situation where an account executive is trading without authority.

"The reason for requiring immediate action to repudiate a mishandled trade is that the CFTC has held that a mishandled trade belongs to the broker. The broker is the one who bears the loss or enjoys the profit and should have the opportunity to take steps to minimize the damage." *Robertson v. Clayton Brokerage Co.*, 587 F.Supp. 678, 684 (N.D.Ga.1984). Given that a futures commission merchant like Anspacher is vicariously liable for its agents' acts within the scope of their employment, *see Rosenthal, supra*, 802 F.2d at 966, Anspacher needs to monitor the conduct of its associated persons.

As Anspacher cannot completely police its branch office personnel, it contracts with its customers to help. Here, Anspacher could have spent a lot of money monitoring the performance of a remotely located broker. These additional monitoring costs, caused by its lack of information as to what its broker was doing in Minot, South Dakota, would have had to have been passed on to its customer, Henderson, in the form of higher commissions. Instead, the notification provision allowed Anspacher to rely on Henderson, a cheaper source of information, to monitor Jensen. Because Anspacher did not have to spend as much on monitoring, Henderson in turn would pay less for services (services that might otherwise not even be available).

Anspacher must insure against the risk of its agent's unauthorized trading and concedes that it is responsible for any diminution in a customer's portfolio in the period between the date it mails the confirmation of an unauthorized trade and the date five business days later when the customer is required to object to Chicago. That period here would run from February 14 through February 22. After February 22, however, Anspacher counted on Henderson to notify it of any unauthorized trading. It would be a waste for Anspacher to monitor after February 22 when Henderson already has the information. If Henderson had complied with the notification provision, then both Anspacher and Henderson would have essentially sustained no damages.

■ While the notification provision in the Agreement plainly told Henderson to call Anspacher's Chicago headquarters, the confirmations sent to Henderson after each trade stated in the lower right-hand corner as follows:

> Please report any differences immediately. The failure to immediately exercise your right to have errors corrected will be deemed your agreement that this statement is correct and ratified.

This trade confirmation, when viewed in isolation and in comparison to the Agreement, creates an ambiguity as to whom a customer should report. *Cf. Stoller, supra,* [1984–86] Comm.Fut.L.Rep. (CCH) ¶ 22,224 at 29,208; *see also Blome v. R.G. Dickinson & Co.,* [1982–1984] Comm.Fut. L.Rep. (CCH) ¶ 21,916 at 27,970 (CFTC 1983). "It does not state specifically to whom these objections must be made." *Stoller, supra,* [1984–86] Comm.Fut.L.Rep. (CCH) ¶ 22,224 at 29,208. As the Commission described an analogous problem in *Stoller:*

> [A] review of the various communications sent to [the customer] by [the futures commission merchant] reveals that, while there is clear notice that errors should be reported, the instructions concerning the reporting of errors are both vague and conflicting. For example, the confirmation statements sent to customers by [the futures commission mer-

chant] note that any differences should be reported immediately.... The statements of account merely advise: "Please report any differences immediately." They do not say how or to whom. Under these circumstances, we conclude that complainant had a duty to inform [the futures commissions merchant] of discrepancies in his account, but there was no "clear and unequivocal" notice creating any duty to report discrepancies to a particular person or office in any particular manner within a particular period of time.

[1984–86] Comm.Fut.L.Rep. (CCH) ¶ 22,224 at 29,208. While each confirmation listed Anspacher's Chicago address and telephone number on the top, the confirmation statement neither advises Henderson to call Chicago nor refers to the Agreement. Moreover, Anspacher could expect that it would be the confirmation slip, not the Agreement, that Henderson would have in his hand when he first notices the unauthorized trades. As the CFTC stated in *Steven v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* [1982–84] Comm.Fut.Law Rep. (CCH) ¶ 21,839 (1983), in discussing non-discretionary accounts, "the customer is obliged to review the matter and report any disagreements to the [futures commission merchant]. This is normally stated on the face of the account or confirmation report." The ambiguity created by the confirmation slip could lead a reasonable customer to conclude that Anspacher was modifying the Agreement by offering a less restrictive notice procedure.

The parties further agree that the Agreement's modification provision—which provided that only Anspacher's president or executive vice-president could amend or modify the Agreement—is valid and enforceable, though itself subject to modification. While Jensen's authority to waive the modification provision (and, derivatively, the notification provision) presents difficult questions of agency law, compare *Cange, supra,* 826 F.2d at 592 n. 8 with *Cange, supra,* 826 F.2d at 596–97 (Easterbrook, J., concurring), it is clear that Anspacher itself had actual and apparent authority to modify the notification provision.

And we cannot say as a matter of law that that is not what Anspacher did.

Thus, we resolve this appeal by holding simply that it cannot be said as a matter of Illinois law[1] that Anspacher's subsequent conduct did not modify the Agreement and thus act to waive Henderson's strict compliance with the Agreement's notification provision. *See Beverly Bank v. Alsip Bank,* 106 Ill.App.3d 1012, 1017, 62 Ill.Dec. 572, 436 N.E.2d 598 (1982); *Illiana Mach. & Mfg. v. Duro–Chrome Corp.,* 152 Ill. App.3d 764, 105 Ill.Dec. 689, 504 N.E.2d 974, 977 (1987). As the Commission said in *Stoller,* "[a]n appropriately clear notification could create a duty in a customer to report errors to a particular person or office within a particular period of time." *Stoller, supra,* [1984–86] Comm.Fut.L.Rep. (CCH) ¶ 22,224 at 29,208. This clear notification cannot be blurred, however, with conflicting signals from the futures commission merchant.[2]

■ If, as we have just held, Henderson's contractual notification duties were not clear, then Anspacher may avoid paying damages only if it can successfully assert an affirmative defense. Whether Anspacher has met its burden of proving its affirmative defenses of estoppel and ratification are fact questions. For estoppel, the question is whether Henderson acted reasonably in complaining only to Jensen, *see Stoller, supra,* [1984–86] Comm. Fut.L.Rep. (CCH) ¶ 22,224 at 29,208 to 29,-209 (CFTC 1984), and for ratification, we ask whether it is "clear from all the circumstances presented that the intent of the customer was to adopt as his own and for all time the trades executed for his account without authorization." *Sherwood v. Mad-*

*da Trading Co.* [1977–1980] Comm.Fut.L. Rep. (CCH) ¶ 20,728 at 23,020 (CFTC 1979). While Henderson's failure to comply with the notification provision is relevant to each question, see *Ellwood v. Mid States Commodities, Inc.,* 404 N.W.2d 174, 181 (Iowa 1987) (discussing cases), we cannot say, viewing the evidence and reasonable inferences most favorably to Henderson, that reasonable jurors could not reach different conclusions. We must accordingly affirm the district court's denial of Anspacher's motion for judgment notwithstanding the verdict on his affirmative defenses. *See, e.g., Freeman v. Franzen,* 695 F.2d 485, 488 (7th Cir.1982), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1400 (1983).

■ Anspacher raises two more claims of error which we need to address. First, Anspacher claims that the district court prejudiced its case by requiring it to disprove Henderson's putative defenses to its breach of contract claim. The court instructed the jury on Anspacher's claim as follows:

> To prevail on its claim, *Anspacher must prove,* 1, that there was a valid and enforceable contract in existence between it and Henderson; 2, that Anspacher performed all of its obligations under that contract; 3, that Henderson breached the contract; 4, *that Henderson's breach of the contract was not justified by the actions of Anspacher or its agent, Jensen;* and 5, that Anspacher was damaged by the breach. (Emphasis supplied.)

Thus, the court instructed the jury that Anspacher must prove that Henderson's breach was not justified by the actions of

---

1. Section IX of the Agreement provides that the rights and liabilities of the parties shall be governed by Illinois law, and it is under Illinois law that the parties argued their cases below. That agreement was reasonable, and we accordingly apply Illinois law.

2. The Commission filed a brief as *amicus curiae* urging that "[w]hile the customer agreement may be relevant to evaluating the intent of the customer and the reasonableness of his actions, it cannot serve as an absolute bar to the customer's recovering damages for his broker's fraud." We do not fully agree with the Commission's

position. We see no reason why the terms of a signed customer agreement could not, as a matter of law, bar a commodities customer from recovering damages for his broker's fraud. *See Shapiro v. Bache & Co.,* 116 Ariz. 325, 569 P.2d 267, 270–71 (1977). Because this case was decided under Illinois law, the Commission's position is less influential than it might otherwise be. Yet the Commission's position in this case, as well as its holdings in *Stoller* and *Blome,* are helpful in showing what would and would not be ambiguous to those who trade in commodities futures.

Anspacher or its agent Jensen. What this means is that the court placed the burden of proving *authorized trading* upon Anspacher, as opposed to requiring Henderson to prove *unauthorized trading*. Requiring Anspacher to prove authorized trading did not prejudice its case because this requirement is equivalent to what Anspacher concedes is its proper burden of proving that it performed all of its obligations under the Agreement, the second item in the instruction. Under the facts of this case, if Anspacher proved the second item, then by definition Henderson could not prove the fourth, and it is extraneous, no matter who is called upon to prove it. In addition, the instructions required Henderson to prove his counterclaim, which would include Henderson proving justification, that is, unauthorized trading. Thus, we are not persuaded that the jury's understanding of the issues was affected by the challenged instruction.

■ Finally, we agree with Anspacher that the $60,000 verdict was excessive. We are disappointed that counsel for Henderson did not own up to this more quickly than he did, continuing to argue in its brief that damages were not excessive because Henderson's total losses equaled $68,000. Only after intensive questioning at oral argument would counsel admit the obvious, that the $28,440.61 original debit balance has not been paid by Henderson and instead has been swallowed by Anspacher.

In his closing argument, Henderson's counsel asked for $33,000 in compensatory damages. Based upon a note the jury sent to the judge during its deliberation, it appears that what the jury did was award Henderson his attorney's fees as well. But the amount Anspacher swallowed, plus the attorney's fees if that is what the jury awarded, are not recoverable damages. We remit Henderson's damages to $31,403.35, which is what Henderson's complaint sought and equals Henderson's account's equity on February 15, 1983.

Each side shall bear its own costs.

AFFIRMED IN PART AND REVERSED IN PART.