Joseph SEMRAD, et al., Petitioners, Appellants,

v.

EDINA REALTY, INC., et al., Petitioners, Respondents.

No. C4-90-1976.

Supreme Court of Minnesota.

Dec. 4, 1992.

Jan Stuurmans, Stuurmans & Karan, P.A., Minneapolis, for appellants.

George F. McGunnigle, Nancy A. Wiltgen, Leonard, Street & Deinard, Minneapolis, for respondents.

Donald D. Smith, Thomsen & Nybeck, P.A., Edinborough Corporate Center East, Edina, amicus curiae for MN Assoc. of Realtors and Nat'l. Assoc. of Realtors.

COYNE, Justice.

Individual investors commenced this action against Edina Realty, Inc., and its two principal officers to recover money lost through investment dealings with Glen Marsh, an Edina Realty sales associate during the time the losses were sustained. The plaintiffs asserted claims of negligence, negligent failure to supervise, fraud, breach of fiduciary duty, sales of unregistered securities in violation of Minn. Stat. chap. 80A, Regulation of Securities; violations of Minn.Stat. chap. 82, the Minnesota Real Estate Brokers Act; and deceptive trade practices. After trial before the district court without a jury, the court ruled that the defendants were liable only to plaintiff Halla–Poe for breach of fiduciary duty. While the court of appeals affirmed the trial court in significant respects, it remanded for reconsideration and "appropriate findings" on the claim of negligent supervision. *Semrad v. Edina Realty, Inc.,* 470 N.W.2d 135 (Minn.App.1991). We affirm in part, reverse in part, and reinstate the trial court's decision.

During the years in question, Edina Realty engaged "sales associates" to transact and complete real estate sales. These sales associates are, by common arrangement in the industry, essentially independent contractors collected in branch offices, but functioning somewhat independently in performing duties incidental to the actual sales transactions. Edina Realty furnished business cards bearing its name and that of the sales associate and desk space in common areas to its sales associates. Until 1984 private office space was also available to associates on a rental basis. Edina Realty managed real estate transactions through its closing department, but did not monitor individual sales associates' mail or telephone conversations. The record indicates that it generally encouraged sales associates to perform in a professional and ethical manner with management communicating the expectation both verbally and by example.

Sales associates were authorized to facilitate the placement of vendors' interests in

contracts for deed with third-party investors only when the placements were incidental to a real estate transaction involving an Edina Realty client. In other words, Edina Realty was not regularly engaged in the business of assignments of vendors' interests. It did not receive any additional commission attributable to the assignments and it did not advertise investment opportunities in contracts for deed. Moreover, it did not undertake to instruct its sales associates regarding marketing techniques for contracts for deed.

Glen Marsh was under contract as a sales associate, an independent contractor, with Edina Realty during the period from 1972 to 1987. The record demonstrates that the nature and scope of the transactions in which he engaged changed and expanded considerably over those years. From 1973 to 1976, he offered vendors' interests in contracts for deed to third-party investors; in 1975 he began purchasing single family homes which he held as income properties, and in 1976 he began offering vendors' interests in contracts for deed in which he himself was the vendee. Then, in 1977 Marsh began selling mortgage notes which purported to be secured by unidentified real property. It appears, however, that Marsh routinely sold mortgage notes on the same property to several buyers. None of the mortgages were recorded and in many cases Marsh, the purported mortgagor, had no recorded interest in the mortgaged property.

In 1982 Marsh began selling what he called contract equity funding notes, printed promissory notes bearing the name of "Five Points Financial Group," telling his investors that their money would be pooled and used to purchase contracts for deed and assuring them that contract equity funding notes were safer than contracts for deed because they were backed by several properties. At about this same time Marsh first solicited investments in Glen Marsh limited partnerships.

The record also discloses that in the early 1980s Marsh incorporated various business entities, into which he transferred his own interests in real property. In addition, he wrote and published a "Monthly Real Estate Newsletter" with "inside tips, new ideas and money saving information." The newsletters were mailed without return address from a printer in Sioux Falls, South Dakota. Marsh's name appeared at the end of the newsletter, followed by Edina Realty's name, address, and telephone number. A regular feature of the newsletter was a review of typical rates of return on investments in the real estate financing market. For example, the May 1986 issue compared a 7¼% yield on FNMA debentures with a 20% yield on real estate secondary financing. From 1981 to 1983 defendant Roger Rovick, the president of Edina Realty, received Marsh's newsletters at his home. Defendant David Rovick, executive vice president, received the newsletters at his home from 1981 to 1986. While neither Rovick made any inquiry about the newsletters, it is clear that the newsletters had never been approved as required by company policy.

Until 1983 Marsh and his personal staff managed his various personal business interests out of his leased private office suite in the Edina Realty building, but in February 1983 Marsh moved his office to a building located across the street from Edina Realty. Edina Realty's closing department handled many transactions involving Marsh's corporations both prior to and after the move. Although it knew that Marsh owned rental property, operated "Mr. Donut" franchises and had contracts for deed available on the secondary market and although it had reason to know that Marsh continued to use Edina Realty's address and telephone to transact some personal business, Edina Realty did not know that Marsh was selling mortgage notes or contract equity funding notes.

For several years Marsh made monthly payments to the holders of the contracts for deed, mortgage notes, and contract equity funding notes. Frequently, when a balloon or lump sum payment became due on a contract for deed or mortgage note, Marsh convinced the investor to reinvest the funds by "rolling over" to a contract equity funding note, which paid a high rate of interest. In December 1986 Marsh

could no longer make the monthly payments due his investors.[1] None of Marsh's investment offerings was registered with any state or federal regulatory agency. On April 28, 1987 the Minnesota Department of Commerce revoked Marsh's real estate license.

All of the plaintiffs were aware of Marsh's association with Edina Realty, and most of them claim that they relied on that association when investing in Marsh's personal business enterprises. Marsh told the plaintiffs, most of whom had no experience with real estate investments, that the contracts for deed and the contract equity funding notes were very safe and reliable investments but, of course, did not inform them of the risks associated with these investments. However, the name "Edina Realty" did not appear on any investment certificates offered by Marsh, and the plaintiffs admittedly understood that the investments were with Marsh's companies, not with Edina Realty. Each plaintiff conceded that neither Marsh nor any one else associated with Edina Realty ever represented that Marsh's companies were affiliated with Edina Realty, that Edina Realty guaranteed payment of contract equity funding notes, or that Edina Realty's managing officers knew Marsh was selling contract equity funding notes.

Virginia and Joseph Semrad, who operated a construction business until the early 1970s, became acquainted with Marsh in 1970, before he became associated with Edina Realty. In 1971 Marsh sold the Semrads a vacant lot on which they built a house that was later listed for sale with Edina Realty through Glen Marsh. In 1973 the Semrads purchased the vendor's interests in two contracts for deed, and by 1975 the Semrads had invested in four more contracts for deed. A third party was the vendee in each of these six contracts for deed, but between 1976 and 1980 the Semrads bought six more contracts for deed, in all of which Marsh was the vendee. Mrs. Semrad did not read the contracts for deed,

and she testified she did not know that Marsh was the vendee on many of them. She knew, however, that the payments came directly from Marsh instead of from third parties. Beginning in 1977, the Semrads began to purchase mortgage notes from Marsh, who represented that the mortgage was safer than a contract for deed. The Semrads understood that Glen Marsh was the debtor on the mortgage note.

Based on their experience in the construction business, the Semrads knew that mortgages should be recorded or filed. They were familiar with the filing stamps and document numbers that indicated recordation. Even though none of the documents which they received bore recordation data, the Semrads made no attempt to record or file the mortgages which they held, instead depending on Marsh to take care of "the details". On several occasions, the Semrads bought more than one mortgage on the same property, sometimes on the same property on the same day. The Semrads neither requested title opinions nor consulted a lawyer. In fact, throughout these many dealings, they never visited Marsh at his Edina Realty office and had no contacts with any Edina Realty personnel.

In 1983 the Semrads invested in a contract equity funding note purporting to be issued by Five Points Financial Group, a division of Glen Marsh Real Estate Investments. Shortly thereafter, the Semrads took contract equity funding notes in satisfaction of mortgage notes or contracts for deed which they had previously purchased. In 1983 and 1984 the Semrads invested in limited partnerships formed by Marsh. Between 1983 and 1986 they enjoyed tax benefits totaling $180,855 by reason of their investment in the limited partnerships and received all payments until Marsh's January 1987 default.

Dorothy Strudwick's relationship with Marsh was similarly complicated since its

---

**1.** Marsh had operated under substantial cash flow deficits for a number of years. In December 1986, the aggregate principal balance due and owing on contracts for deed, mortgage notes, and contract equity funding notes was $4,150,000, and Marsh's limited partnerships showed a cumulative net income deficit of $3,260,000.

inception in 1976 when she sold a house. Shortly thereafter, when Strudwick bought another house, Marsh persuaded her to make a small down payment and invest the remainder of the proceeds from the sale of the first house in contracts for deed. In 1976 and 1977 Strudwick invested in four contracts for deed and lent Marsh's investment company, Five Points Limited, $35,000. In April 1983 Marsh exchanged the contracts for deed for contract equity funding notes. Strudwick also invested in additional contract equity funding notes.

Except for plaintiff Romanski, who received a contract equity funding note as a gift, the other seven plaintiffs acquired contract equity funding notes either by "rolling over" investments in contracts for deed or mortgages or by direct purchase. Marsh made all the payments due on contracts for deed, mortgage notes and contract equity funding notes until December 1986. By that time all of the contracts for deed had been paid off or rolled over into contract equity funding notes.

■ Both the trial court and the court of appeals dismissed plaintiffs' claim under the Real Estate Brokers Act, Minn.Stat. §§ 82.17–.34 (1987), concluding that the statute does not provide a private cause of action. The court of appeals observed that chapter 82 expressly grants enforcement powers to the commissioner of commerce alone and that, while the legislature was aware of the method by which it could create a private right of action,[2] it did not do so. *Semrad,* 470 N.W.2d at 142–43. Moreover, the penalty provision of the statute makes violation a gross misdemeanor but makes no reference to civil liability. Minn.Stat. § 82.32 (1990).

The legislature did, however, establish a real estate education, research and recovery fund (Minn.Stat. § 82.34) as part of its 1973 revision and reenactment of the Real Estate Licensing Act. *See Moe v. Centurion Inv. Co.,* 293 N.W.2d 826, 828–29 (Minn.1980). Minn.Stat. § 82.34, subd. 7 (1990), contains this provision:

> When any aggrieved person obtains a final judgment in any court of competent jurisdiction against an individual licensed under this chapter, on grounds of fraudulent, deceptive, or dishonest practices * * * *arising directly out of any transaction when the judgment debtor was licensed and performed acts for which a license is required under this chapter* * * * the aggrieved person may, upon the judgment becoming final, and upon termination of all proceedings, including reviews and appeals, file a verified application in the court in which the judgment was entered for an order directing payment out of the recovery portion of the fund of the amount of actual and direct out of pocket loss in the transaction, but excluding any attorney's fees, interest on the loss and on any judgment obtained as a result of the loss, up to the sum of $150,000 of the amount unpaid upon the judgment * * *.

(Emphasis supplied). However, inasmuch as the plaintiffs elected not to name Glen Marsh as a defendant, and since the record contains no reference to an existing judgment against Marsh on grounds of fraudulent, deceptive, or dishonest practices, it is apparent that the plaintiffs could not perfect a claim under Minn.Stat. § 82.34, subd. 7. The plaintiffs do not contend that either of the individual defendants engaged in any fraudulent, deceptive, or dishonest practices, but only complain of Marsh's deception.

■ Similarly, the trial court rejected the "controlling persons" theory of recovery, first concluding that defendants were not "controlling persons" as defined in Minn. Stat. § 80A.23, subd. 3 (1987), which provides that every person who directly or indirectly controls a securities violator is jointly and severally liable. Both lower courts properly applied the two-prong test for controlling person liability defined in *Metge v. Baehler,* 762 F.2d 621 (8th Cir. 1985), *cert. denied sub nom. Metge v. Bankers Trust Co.,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986):

> [P]laintiffs must establish, first, that the defendant * * * 'actually participated in

---

**2.** *See, e.g.,* Minn.Stat. chap. 80A, in which a private cause of action is available.

(*i.e., exercised* control over) the operations of the [violator] in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this later power was exercised.'

762 F.2d at 631 (emphasis in original) [*quoting Metge v. Baehler,* 577 F.Supp. 810, 817–18 (S.D. Iowa 1984)]. In adopting this test, the *Metge* court noted that the test comports with *Myzel v. Fields,* 386 F.2d 718 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), in which the Eighth Circuit stated that the controlling person statute is "remedial and is to be construed liberally." 762 F.2d at 630. In urging the rejection of the *Metge* test, plaintiffs suggest to this court that the controlling person issue be decided by application of the *Myzel* test:

The statute [regulating sale of securities] is remedial and is to be construed liberally. It has been interpreted as requiring only some *indirect* means of discipline or influence short of actual direction to hold a 'controlling person' liable.

386 F.2d at 738 (emphasis supplied).

We are not persuaded, however, that the *Myzel* rationale has any vitality as a test for controlling person liability. While *Metge* did not overrule *Myzel,* it effectively supplanted the *Myzel* rationale for controlling person liability by adopting a test that incorporates the latter's analysis. *See Metge,* 762 F.2d at 630–31.[3] The *Metge* test is consistent with the position taken by a majority of federal courts. Kuehnle, 14 J. of Corp.L. at 359–60. Indeed, the *Metge* test is more favorable to plaintiffs than that applied in the Second, Third, and Ninth Circuits, which require a showing of culpable participation in the wrongful transaction. *See Metge,* 762 F.2d at 631, expressly rejecting the "culpable participation" test; Kuehnle, 14 J. of Corp.L. at 354 n. 211.

The plaintiffs then argue that even if the *Metge* test is appropriate, the lower courts erred by applying it to Marsh's business entities rather than to Marsh personally. Ordinarily, when controlling person liability is asserted against a defendant stockbroker whose employee has violated securities law, it seems appropriate to apply the control test to the employee personally since the violation was in all probability closely related to the employment. *See Moss v. Morgan Stanley, Inc.,* 553 F.Supp. 1347, 1357–58 (S.D.N.Y.1983), *aff'd,* 719 F.2d 5 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) (plaintiff may establish prima facie case of control by showing that an investment banker employee acted within scope of employment). In the rather unusual circumstances of this case, however, where the employer is not in the securities business, it would seem inappropriate to find the requisite control based only on the employer's supervision of the employee in carrying out the employer's business. Securities regulations should not be so construed to impose liability on corporations (such as Edina Realty) whose business is unrelated to securities trading.

Here, the question of whether to apply the control test to Marsh's enterprises or to Marsh personally is of no significance because there is enough evidence to support the trial court's finding that the defendants lacked the practical ability to control the activities that constituted Marsh's securities violations. Consequently, the second prong of the *Metge* test has not been established.

Addressing the plaintiffs' negligent supervision claims, the trial court considered whether liability could be based on Edina Realty's relationship with Marsh by application of Restatement (Second) of Torts § 317, or Edina Realty's relationship with plaintiffs, by application of Restatement (Second) of Agency § 213. The trial court

---

**3.** The federal controlling person provision, 15 U.S.C. § 77o, refers only to "control" and does not have the "direct or indirect" language contained in Minn.Stat. § 80A.23, subd. 3 (1990). However, federal courts have generally recognized that "control" includes indirect means of influence. Kuehnle, *Secondary Liability Under the Federal Securities Laws—Aiding and Abetting, Conspiracy, Controlling Person, and Agency: Common–Law Principles and the Statutory Scheme,* 14 J. of Corp.L. 313, 356 (1988).

determined that no liability existed on either basis. The court of appeals affirmed with regard to Restatement (Second) of Agency § 213, but concluded that Edina Realty would be liable under Restatement (Second) of Torts § 317 if it should have foreseen Marsh's conduct. 470 N.W.2d at 147.

We are of the opinion, however, that to apply Restatement (Second) of Torts § 317 under the circumstances of this case is to extend section 317 far beyond its intended scope. Section 317 is found under Title A. Duty to Control Conduct of Third Persons, of Topic 7 of the Restatement (Second) of Torts. The general principle of Title A is set out at section 315:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

A special application of that general principle is found at section 317:

### § 317. Duty of Master to Control Conduct of Servant

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>
> (ii) is using a chattel of the master, and
>
> (b) the master
>
> (i) knows or has reason to know that he has the ability to control his servant, and

> (ii) knows or should know of the necessity and opportunity for exercising such control.

The placement of section 317 in the Restatement and the language of sections 315 and 317 unambiguously limit the scope of section 317 to a duty to prevent an employee from inflicting personal injury upon a third person on the master's premises or to prevent the infliction of bodily harm by use or misuse of the employer's chattels. In short, the entire thrust of section 317 is directed at an employer's duty to control his or her employee's physical conduct while on the employer's premises or while using the employer's chattels, even when the employee is acting outside the scope of the employment, in order to prevent intentional or negligent infliction of personal injury. Nothing in section 317 calls for its application in a case involving economic loss only.

Moreover, the transactions at issue here did not take place while Marsh maintained his office at Edina Realty. Three weeks before the trial began the trial court ruled that the statute of limitations, Minn.Stat. § 80A.23, subd. 1 (1988), barred any action with respect to transactions which took place prior to July 23, 1984. The court of appeals affirmed this ruling and the plaintiffs do not complain of it here. In February 1983 Marsh leased office space in a building at 4010 West 65th Street where he operated his investment businesses. In none of the transactions which took place after July 23, 1984 did any plaintiff take an assignment of the vendor's interest in a contract for deed. All of the post-July 23, 1984 transactions between Marsh and the plaintiffs involved the sale and purchase of securities called "contract equity funding notes" issued by Five Points Financial Group, a division of Glen Marsh Real Estate Investments.

The pivotal issue presented here is whether Marsh had authority, either actual or apparent, to hold himself out as representing Edina Realty when dealing in assignments of interests in contracts for deed and mortgage notes and in the sale and issuance of contract equity funding

notes. Generally speaking, a principal is liable for the act of an agent committed in the course and within the scope of the agency and not for a purpose personal to the agent. *Larson v. Fidelity Mutual Life Ass'n*, 71 Minn. 101, 73 N.W. 711 (1898). A principal is also liable for the negligent performance of a nondelegable duty by an independent contractor. *Lamb v. South Unit Jehovah's Witnesses*, 232 Minn. 259, 45 N.W.2d 403 (1950). Liability, however, follows only upon a finding that the act causing injury was within the scope of the agency. Thus, this court has held that a principal is not liable for the unauthorized intentional tort of its agent. *Kasner v. Gage*, 281 Minn. 149, 161 N.W.2d 40 (1968) (sales corporation not liable for its agent's misappropriation of a competitor's records because such conduct was neither authorized nor incidental to authorized conduct and, therefore, was not within the scope of the agency).

■ The plaintiffs contend that because Edina Realty at one time authorized its sales agents to arrange the sale of the vendor's interest in contracts for deed generated by real estate sales in which Edina acted as real estate broker, Marsh's dealings in securities were actually authorized or, at least, incidental to authorized conduct. The trial court found, however, that Edina Realty never authorized the sale of mortgage notes or contract equity funding notes on its behalf. Nor was Edina Realty in the securities business; its business was acting as agent for the buyers or sellers of interests in real estate and although the assignment of the vendor's interest in a contract for deed generated in a real estate transaction in which Edina Realty acted as agent for buyer or seller probably could be said to be incidental to that agency, Edina Realty never engaged in the sale of mortgage notes or contract equity funding notes and the sale of such instruments was not incidental to the scope of the agency relationship between Edina Realty and Marsh.

Furthermore, each of these plaintiffs [4] conceded that Glen Marsh never represented that Glen Marsh Real Estate Investment Corporation or Five Points Financial Group was affiliated with Edina Realty, that Edina Realty approved contract equity funding notes as suitable for sale by its sales associates or guaranteed payment of such notes, or that Edina Realty's management even knew that Marsh was selling such investments. Each plaintiff has also admitted that no one else connected with Edina Realty ever represented that either Glen Marsh Real Estate Investment Corporation or Five Points Financial Group was affiliated with Edina Realty, that Edina Realty guaranteed payment of the notes, or that Edina Realty had approved contract equity funding notes as suitable for sale. Finally, the plaintiffs admit that their investments were made by tendering checks payable to Glen Marsh or one of his companies and that they knew that the contract equity funding notes were issued by Five Points Financial Group, a division of Glen Marsh Real Estate Investment Corporation, not by Edina Realty.

On the basis of the facts found, all of which have more than an adequate basis in the record, the trial court concluded, as we believe it was required to conclude, that Marsh's sale of contract equity funding notes was neither actually nor apparently authorized by Edina Realty.

Accordingly, we affirm the court of appeals' decision in part, reverse in part, and reinstate the judgment entered by the trial court.

YETKA, WAHL and GARDEBRING, JJ., dissent.

YETKA, Justice (dissenting).

I would reverse the court of appeals and remand to the trial court for determination of the question of whether Marsh had authority to conduct the activities in question here.

**4.** One of the plaintiffs, a daughter of Joseph and Virginia Semrad, had no dealings with Marsh. She was the recipient of the gift of a contract equity funding note purchased by her parents. The trial court made no other findings of fact with respect to this plaintiff.

The trial court found no liability under Restatement 317 because the investment transactions did not occur on Edina Realty's premises or with their property. In so finding, the trial court applied Restatement 317(a) to its findings of fact. This is a mixed question of law and fact and is subject to our independent review. *Meyering v. Wessels*, 383 N.W.2d 670, 672 (Minn. 1986). I believe that the record contains ample evidence to dictate the conclusion that, for purposes of Restatement 317(a), Marsh conducted his investment activities on Edina Realty's premises and with their property. Marsh often gave his investors Edina Realty business cards, newsletters, and envelopes. The investors frequently called Marsh at his Edina Realty office— indeed, before Marsh moved his personal business activities out of the Edina Realty building, the switchboard was having difficulty handling the volume of calls for Marsh. This use of Edina Realty's premises and property is substantially greater than the brokers' use of their employer's premises and property in *Harrison v. Dean Witter Reynolds, Inc.*, 715 F.Supp. 1425 (N.D.Ill.1989), and I believe this use satisfies Restatement 317(a).

Because the trial court found that Restatement 317(a) had not been satisfied, it did not apply Restatement 317(b). Accordingly, I would remand to the trial court the question of whether the requirements of Restatement 317(b) are met (*i.e.*, did Edina Realty have reason to know of its ability to control Marsh and should it have known of the necessity and opportunity to exercise such control).

As to the issue of actual authority, the trial court held that Marsh's investment activities were outside the scope of his actual authority because the activities did not benefit Edina Realty. The court of appeals held that the trial court committed a legal error by requiring an act be for the principal's benefit for it to be actually authorized. *Semrad v. Edina Realty, Inc.*, 470 N.W.2d at 143. As the court of appeals stated, an employee's motivation to serve the employer is irrelevant when determining an employer's vicarious liability for an employee's intentional tort. *Id.* (citing

*Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 310 (Minn.1982)).

After pointing out this legal error, the court of appeals went on to determine whether Marsh had actual authority to sell the investments. The court applied the *Marston* test, which requires that the acts be "foreseeable, related to and connected with acts otherwise within the scope of employment." *Id.* at 144 (quoting *Marston*, 329 N.W.2d at 311). The court found that the evidence would not support the finding that Marsh's investment sales were foreseeable. *Id.*

Whether an employee's actions were foreseeable is a factual issue. *Marston*, 329 N.W.2d at 311. The court of appeals inappropriately acted as a trier of fact when it concluded that Marsh's conduct was not foreseeable. "An appellate court exceeds its proper scope of review when it bases its conclusions on its own interpretation of the evidence and, in effect tries the issues anew and substitutes its own findings for those of the trial judge." *Stiff v. Associated Sewing Supply Co.*, 436 N.W.2d 777, 779 (Minn.1989) (citation omitted).

I note that the record contains several indications that Marsh's investment sales were not all that unrelated to some of Edina Realty's business activities. Edina Realty authorized its sales associates to place vendor's interests in contracts for deed with third-party investors. One of Edina Realty's wholly-owned subsidiaries conducts a mortgage banking business. The Semrads invested in Marsh's limited partnerships; Edina Realty also has engaged in the business of syndicating limited partnerships for apartment buildings and land development. The facts supporting a finding that Marsh's activities were not foreseeable are not as sparse as the court of appeals' conclusion suggests. When the record is looked at as a whole, there is a glaring lack of supervision on the part of the officers of Edina Realty in controlling the actions of this agent. Rather than say that Edina Realty was unaware of Marsh's outside dealings, it actually ap-

peared to have encouraged them. Such total lack of supervision on the part of management when many of the employees seemed to be more fully aware of Marsh's activities makes it difficult to see how the principal here can avoid responsibility. The trial court should decide the factual question of foreseeability.

The majority opinion implicitly assumes that various statutory or common law actions would lie against Marsh for his tortious acts. Under the common law doctrine of respondeat superior, plaintiffs may hold Edina Realty vicariously liable—liable without fault—for its employees' violations of law, provided plaintiffs can show that Marsh had actual authority to do what he did or had apparent authority. "Principals are strictly liable for their agents' acts— even if the agents are not employees—if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized." *Rosenthal & Co. v. Commodity Futures Trading Comm'n*, 802 F.2d 963, 966 (7th Cir.1986) (commodity brokerage vicariously liable for fraud of salesperson).

Actual authority should be given a broad reading: An employer is liable not only for acts it specifically authorizes its employee to do, but also for acts within the scope of employment. Restatement (Second) of Agency §§ 216, 219(1). The trial court erred by only applying Restatement (Second) of Torts § 317 in its analysis of scope of employment. To limit scope of employment to acts occurring on the employer's premises or property and to require some form of physical injury in order for plaintiffs to recover, as occurs in section 317, is too limited a view of common law respondeat superior. "In cases involving intentional wrongdoing, the scope of employment doctrine acquires something of an abstract quality, for such wrongdoing is never really within the scope of an employee's employment: if it were, then the employer's liability would be direct, not vicarious." *Harrison v. Dean Witter Reynolds, Inc.*, 715 F.Supp. at 1430; *see* Restatement (Second) of Agency, § 212 & Comment a; *see generally* Carol M. Lynch, Note, *Rule 10b–5—The Equivalent Scope of Liability Un-*

*der Respondeat Superior and Section 20(a)—Imposing a Benefit Requirement on Apparent Authority*, 35 Vand.L.Rev. 1383 (1982).

As for the issue of apparent authority, although an employer is generally not liable in respondeat superior for the tortious acts of an employee acting solely for the employee's own purposes, an employer is liable in such situations when it is the existence of the employer-employee relationship that gives the employee the opportunity to accomplish the tort. Restatement (Second) of Agency, § 216 & Comment a. As the majority opinion states, most of the investors in Marsh's financial enterprises claim they relied on his association with Edina Realty when investing.

Several facts suggest that such a claim is not baseless. For example, for several years, Marsh conducted his activities at Edina Realty's offices and used the company mails and telephones. Also, his newsletter carried the address of Edina Realty's offices. Even after Marsh moved his activities out of Edina Realty's offices, his newsletter continued to carry the Edina Realty address. Moreover, not only Marsh's clients, but also officers of Edina Realty received his newsletter at their homes.

I would reverse the court of appeals and hold Edina Realty liable on the basis of respondeat superior. As an alternative, I would remand on the question of foreseeability under Restatement 317(b).

WAHL, Justice (dissenting).

I join the dissent of Justice Yetka.

GARDEBRING, Justice (dissenting).

I join the dissent of Justice Yetka.